UNITED STATES OF AMERICA, INTERSTATE
COMMERCE COMMISSION, ATCHISON, TO-
PEKA & SANTA FE RAILWAY COMPANY, ET
AL. *v.* MERCHANTS & MANUFACTURERS TRAF-
FIC ASSOCIATION OF SACRAMENTO ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 452.   Argued October 19, 1916.—Decided December 4, 1916.

Appellant carriers made applications to the Interstate Commerce
Commission, under § 4 of the Act to Regulate Commerce, as amended
by the Act of June 18, 1910, c. 309, 36 Stat. 539, 547, for authority
to continue existing tariffs (and, more generally, to continue an
existing method) whereby rates were made lower for certain ports
and inland cities than for certain places less distant from points of
origin.

*Held*, that, in passing on such applications, the Commission was em-
powered, while granting the relief as asked in respect of the ports,
to grant it in a less degree only in respect of the inland cities, thus
making a distinction between them and the ports not made by the
tariffs or sought for in the applications.

The power of the Commission, under § 4 of the Act to Regulate Com-
merce, as amended June 18, 1910, is not limited to granting or
denying *in toto* the precise relief applied for by a carrier; but when-
ever, following such an application, the Commission has considered
the special circumstances affecting the particular carrier in its rela-
tions to that section, it may exercise a broad administrative discre-
tion in determining from time to time the relief which such carrier
should receive.

*Quære*, whether application by the carrier is a prerequisite to the
granting of relief under § 4 as amended.

In a proceeding under § 4, as amended, the Commission represents
the public and the carrier is the only necessary party; interested
communities and shippers, though customarily heard, need not be
notified, and, at least in the absence of participation, are not
bound.

Such shippers or communities as deem themselves injured by dis-

crimination or unreasonable rates in tariffs filed pursuant to orders made by the Commission under amended § 4 have their remedy, not in applying for a rehearing of the proceedings in which such orders were made, but by direct applications to the Commission for relief under §§ 13 and 15.

That part of amended § 4 which provides that when rates have been reduced in competition with water routes they shall not be increased unless, upon hearing, the Commission finds a reason in changes of conditions other than the elimination of water competition, has no application to a case in which the complaint is based not on increase but on difference of rates; in which the elimination of water competition is denied by the parties complaining; and in which the change complained of was part of a general readjustment of transcontinental rates made necessary by increase of water competition and authorized by the Commission after prolonged hearings.

231 Fed. Rep. 292, reversed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Underwood* for the United States.

*Mr. Joseph W. Folk* for the Interstate Commerce Commission.

*Mr. John E. Alexander* for appellees:

The orders complained of and the tariffs filed thereunder operated, first, to increase freight rates to and from Sacramento, Stockton, San Jose and Santa Clara, and second, to remove those cities from the list of "California Terminals" and classify them as "intermediates." The increase in rates was unjustified; and depriving the four cities of the benefit of terminal rates was unreasonable and discriminated against them in favor of San Francisco and Oakland.

The carriers had petitioned, not to change rates, but to continue the then method of rate-making under which

these four cities were given the same rates as the ports. The only point at issue was whether higher rates could be charged to intermountain points. The last plan submitted by the carriers before the final order of the Commission was, in effect, a request that the terminal situation be not changed, and the Commission so regarded it. The Commission, however, adopted a new scheme without taking evidence and without any corresponding application before it. The resulting tariffs increased the rates of the complaining cities as above stated. Their protests and demands for rehearing were denied. Thus they were deprived of valuable interests without due process of law.

The "long and short haul" clause of § 4 of the act, as amended, is mandatory, except in special cases where a particular carrier presents a specific application for relief and after investigation the Commission finds that a special case exists. The proviso does not mean that the Commission may of its own motion, without application or hearing, make orders of exemption. It may only enter an order in a special case, though afterwards, the matter thus being before it, it may modify that particular order. It has, however, no rate-making authority, and may modify its orders only after hearing with notice to all interested parties.

Respondents were entitled to such a hearing under § 4. *United States* v. *Louis. & Nash. R. R. Co.*, 235 U. S. 314, 321.

Sections 13 and 15 have no application. The former contemplates only complaints for acts done or omitted by the carrier, as where their rates are unreasonable or discriminatory as regards certain persons or localities—such acts as are unlawful under §§ 1, 2 and 3. In such cases the party injured may complain to the Commission, but where the complaint respects a wrongful act done by the Commission itself, the remedy lies with the courts.

The District Court had jurisdiction to grant the relief both independently and by derivation from the Commerce Court. Judicial Code, § 207, par. 2; *id.*, § 208; Act of October 22, 1913, c. 32, 38 Stat. 208, 219. This court has repeatedly held that where orders of the Commission exceed its authority, are not preceded by fair hearing, are erroneous in law or contrary to the indisputable evidence, they may be set aside by the federal courts.

Filing tariffs as directed by the orders did not constitute compliance with § 4. It is the orders themselves that are complained of. Besides having been filed on less than 30 days' notice, and without complying in other respects with § 6, these tariffs were not the voluntary acts of the carriers. They could not amount to a waiver of that which § 4 requires for the protection of public and private rights.

The last paragraph of § 4, as amended, prohibits this increase of rates. Lowering of rail rates because of water competition took place both before and after June 18, 1910. There are no "changed conditions" other than the elimination of such competition. The complaining cities are within the influence of water competition as much now as ever, and quite in the same manner as the port cities. The amendment of June 18, 1910, was meant to evince the policy of Congress that communities and industries built up, as these were, under rates granted by rail carriers because of water competition, should be deemed to have acquired inchoate rights which such carriers might not thereafter destroy.

The decree merely enjoins the enforcement of the order in so far as it was made without authority. It works no hardship or discrimination against intermediate points in California or Nevada. No confusion can follow; the only effect is that the carriers must apply the San Francisco rate to the four cities mentioned.

MR. JUSTICE BRANDEIS delivered the opinion of the
court.

By the Act of June 18, 1910, c. 309, 36 Stat. 539, 547,
amending § 4 of the Act to Regulate Commerce, carriers
were prohibited from charging more "for a shorter than
for a longer distance over the same line or route in the
same direction" without obtaining authority from the
Interstate Commerce Commission so to do. A period of
six months from the passage of the amendment was pro-
vided within which carriers might file application for
authority to continue charges of that nature then lawfully
existing.

For many years prior to 1910 it had been a common
practice to make freight rates from the East to Pacific
coast points lower than to intermountain territory, be-
cause of competition by the Atlantic-Pacific Ocean car-
riers. About 185 interior cities near the coast had been
granted the same transcontinental rates as the ports of
San Francisco and Oakland, because the competing water
carriers customarily "absorbed" the local rates or charges
from the ports to those cities. Among the interior cities
thus treated as "Pacific Coast Terminals" were Sacra-
mento, Stockton, San Jose and Santa Clara. The extent
to which the higher rates to intermountain territory were
justified and the proper basis for "back haul" rates had
been the subject of many hearings before the Interstate
Commerce Commission.

Proceeding under § 4 as amended, six railroads applied
to the Commission under date of December 7, 1910, for
relief in respect to westbound transcontinental commodity
rates. The applications, after enumerating the then
existing tariffs, sought authority specifically "to continue
all rates shown in the above-named tariffs from eastern
shipping points designated to Pacific coast terminal
points" and generally "to continue the present method of

making rates lower at the more distant points than at the intermediate points, such lower rates being necessary by reason of competition of various water carriers" from Atlantic to Pacific ports.  After prolonged hearings the Commission entered its so-called Fourth Section Order No. 124, by which, while declining to grant the applications as made, it authorized charging, in some respects, lower rates for the longer hauls.  The limitation of such charges was set by a zone system and rate percentage basis prescribed by the Commission, which involved an extensive readjustment of rates; but the existing practice of treating these interior cities as terminals was not disturbed.  The validity of the order was attacked by the carriers in the courts and after three years of litigation, finally sustained in *Intermountain Rate Cases,* 234 U. S. 476.

Meanwhile the "effective date" of the order had been extended by the Commission.  After the decision of this court, further extensions of the "effective date" were sought by the carriers and granted.  Some modifications of the order were proposed by the carriers.  Additional hearings were had in which many shippers participated.  Changes in conditions occurring since the entry of the original order on July 31, 1911, were considered—among others, that Congress had passed the Act of August 24, 1912, giving the Commission jurisdiction over transportation "by rail and water through the Panama Canal"; that the Canal itself had been opened on August 15, 1914; that competing ocean rates had been lowered and service improved; and that the ocean carriers had discontinued the practice of "absorbing" rates from the ports to interior cities.  An elaborate supplemental report was made by the Commission on January 29, 1915, and another on April 30,, 1915.  The propriety of modifications in addition to those proposed by the carriers was shown and a new plan for constructing "back haul" rates, devel-

oped by the Commission, was eventually embodied in the Amended Fourth Section Order No. 124 of April 30th, 1915, and adopted by the carriers in the tariffs filed thereunder. Following the limitation imposed by the amended order, the tariffs filed confined the low "Terminal" rates to ports of call like San Francisco and Oakland; and the interior coast cities including Sacramento, Stockton, San Jose and Santa Clara, were subjected to rates materially higher than San Francisco and Oakland, though much lower than those to intermountain territory.

Representatives of these four cities, conceiving them aggrieved by the refusal to grant them the same rates as the ports and alleging that they had participated in whole or in part at hearings which preceded the entry of the last amendment order, applied to the Commission for a rehearing and when their application was denied, brought this suit in the District Court to restrain the enforcement as to them of the amended order, and of the tariffs filed thereunder. The City of Santa Clara and associations representing the traffic interests of Sacramento, Stockton and San Jose joined as plaintiffs. The United States, the Interstate Commerce Commission and the six railroads were made defendants. The bill alleged, among other things, that these cities had for a number of years enjoyed the same rates as San Francisco and Oakland; that large industries and other businesses had been established there because they enjoyed terminal rates; that their commercial importance and prosperity would be ruined if the rates were withdrawn; that no changed conditions existed justifying a withdrawal of terminal rates; that they had not been parties to the proceedings in which the orders were made; and that the "orders authorizing the withdrawal of terminal rates" from them were, among other things, "discriminatory and unjust, were made without said cities having their day in court or without giving them an opportunity to show the unreasonableness thereof, that

no justification for such increase was shown, and the order of April 30, 1915, was without evidence, that petitioners have heen denied the equal protection of the law and deprived of property without due process of law, to their irreparable damage."

The case was heard before three judges; and a final decree was entered which declared that the "orders of the Interstate Commerce Commission of January 29, 1915, and April 30, 1915, in Fourth Section Applications Nos. 205, 342, 343, 344, 350 and 352," in so far as they authorize the carriers to charge for the transportation of westbound transcontinental freight destined to Sacramento, Stockton, San Jose and Santa Clara, California, "any greater amount than is concurrently charged for the like carriage of like freight to San Francisco and Oakland, California, were beyond the statutory powers of the Interstate Commerce Commission, and the enforcement thereof should be enjoined; and said orders in the particulars above mentioned are hereby canceled and set aside." The decree also enjoined and canceled to like extent the tariffs filed in pursuance of such orders. The District Court rested its decision that the Commission had no statutory power to enter the amended order upon the ground, that an order authorizing higher rates to these interior cities could not legally be entered unless there was an "application" to it by the carriers for that specific purpose and "a hearing upon that particular application as in a special case"; that there had been no such application and hearing and that consequently the orders were void and the tariffs filed in pursuance thereof illegal. *Merchants & Manufacturers Traffic Ass'n et al.* v. *United States et al.*, 231 Fed. Rep. 292.

The appeal, in which all the defendants joined, raises important questions involved in the administration of the Fourth Section as amended June 18, 1910, namely:

First: Is it essential to the validity of an order au-

thorizing a lower rate for a longer haul, that it be based upon an application asking only the precise relief granted?

Second: What is the remedy of a community or shipper which deems itself aggrieved by the order made?

The orders here in controversy were confessedly based upon applications made by the carriers. Both the amended orders and the decree recite by numbers the applications dated December 7, 1910. The objection made by the appellees is that the limited authority granted by the Commission had not been applied for; since the carriers asked specifically for leave to continue lower rates, which were the same for ports and for interior California cities, but the Commission permitted these rates to ports while it denied like rates to the interior cities. Respondents deny that the District Court holds in effect that applications for relief must be granted *in toto* or denied *in toto;* but such is the necessary effect of its decision. Amended § 4 empowers the Commission "upon application" to authorize a carrier "to charge less for longer than for shorter distances." These carriers asked leave, among other things, to charge on westbound transcontinental freight to about 193 coast and interior cities much less than to intermountain territory. The Commission permitted them to charge, to eight of these cities which were ports, *as much less* as the applications requested; but as to the other 185, which were interior cities, including the four complaining here, permitted the carriers to charge only *somewhat less*. In other words, the Commission granted a part of the relief asked. The District Court says it had no power so to do. But there is nothing in the act to justify limiting the power of the Commission to either a grant or a denial *in toto* of the precise relief applied for. Such a construction would make § 4 unworkable and defeat the purpose of the amendment. It is at variance with the broad discretion vested in the Com-

mission and the prevailing practice of administrative bodies. It fails to give effect to the provision that "the commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section." It is inconsistent with *Intermountain Rate Cases*, 234 U. S. 476, where the order sustained granted relief very different from that applied for; and it finds no support in *United States* v. *Louisville & Nashville Railroad*, 235 U. S. 314, 322, cited by the District Court, in which case relief from the operation of the Fourth Section had not been granted. The clause in Amended Fourth Section which declares "That upon application to the Interstate Commerce Commission such common carrier may in special cases, after investigation, be authorized by the Commission to charge less for longer than for shorter distances" was designed to guard against the issue, by the Commission, of general orders suspending the long and short haul clause and to ensure action by it separately in respect to particular carriers and only after consideration of the special circumstances existing. Whenever such consideration has been given—"the commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section."

It may be doubted whether application by the carrier is a prerequisite to the granting of relief. As was said in *Intermountain Rate Cases*, 234 U. S. 476, 485, § 4 vests in the Commission the "primary instead of a reviewing function" to determine the propriety of a lesser rate for a longer distance; and § 13 declares that the Commission "shall have the same powers and authority to proceed with any inquiry instituted on its own motion as though it had been appealed to by complaint or petition under any of the provisions of this Act, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had

excepting orders for the payment of money." Unless
formal application be an indispensable prerequisite to the
exercise by the Commission of the power granted by the
Fourth Section, its absence or a defect in it could be
waived; and it would be waived by the filing of tariffs
under the order entered. For the order is permissive
merely. The carrier is the only necessary party to the
proceeding under § 4. The Commission represents the
public. While it is proper and customary for communities
or shippers interested to participate in hearings held, there
is no provision for notice to them. They are not bound by
the order entered; at least in the absence of such participa-
tion. And if the rates made by tariffs filed under the au-
thority granted seem to them unreasonable, or unjustly
discriminatory, §§ 13 and 15 afford ample remedy. Re-
spondents contend that, after the amended order was
entered and the tariffs filed, they did apply to the Com-
mission for relief "but were denied the right of a hearing"
and that "their protest and demand were ignored and
denied." What they did was to petition for a "rehearing"
in the proceedings under the Fourth Section, to which
they now say they were not parties, instead of applying
for redress under § 13, as they had a legal right to do.
They mistook their remedy. To permit communities or
shippers to seek redress for such grievances in the courts
would invade and often nullify the administrative au-
thority vested in the Commission; and, as this case illus-
trates, the attempt of the court to remove some alleged
unjust discriminations might result in creating infinitely
more. The decree of the District Court cancels the
amended order and the tariff only so far as it concerns the
four complaining cities and thereby discriminates perhaps
most unjustly in their favor as against the other 181 in-
terior cities.

It was also contended on behalf of the four cities that
the amended orders violated the clause added to § 4 by

the Act of June 18, 1910, which provides that "Whenever a carrier by railroad shall in competition with a water route or routes reduce the rates on the carriage of any species of freight to or from competitive points, it shall not be permitted to increase such rates unless after hearing by the Interstate Commerce Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition." The answers to this contention are many. What these four cities complain of is not increase of rates but the fact that San Francisco and Oakland may be given rates lower than theirs; and they strongly deny that water competition has been eliminated. Indeed, it was the increased effectiveness of water competition due to the opening of the Panama Canal—a notable change in conditions—which compelled the rate readjustment of which they complain; and the higher rates to the interior cities made under authority of the Commission were granted after prolonged hearings as part of the general readjustment of transcontinental rates. The provision relied upon has no application to such a case.

The decree of the District Court must be reversed with directions to dismiss the bill.

*Reversed.*