[S.F. No. 22715. In Bank. Mar. 8, 1971.]

HENRY WOOD et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC GAS AND ELECTRIC COMPANY et al.,
Real Parties in Interest.

## COUNSEL

D'Army Bailey, Michael L. Woods, Michael S. Zola, Gilbert T. Graham, Edward J. Imwinkelried, Benjamin Travis and Sidney Wolinsky for Petitioners.

Mary Moran Pajalich, Sheldon Rosenthal, Timothy E. Treacy and Donald C. Moraney for Respondent.

Robert E. Michalski, F. T. Searls, John C. Morrissey, J. Bradley Bunnin and Joseph S. Englert, Jr., for Real Parties in Interest.

## OPINION

**WRIGHT, C. J.**—Petitioners, Henry Wood and Genevera Gonzales, seek review of decision No. 76065 of the Public Utilities Commission ordering dismissal of cases brought by them against Pacific Telephone and Telegraph Company (hereinafter PT&T) and Pacific Gas and Electric Company (hereinafter PG&E) challenging the validity of the two utilities' credit rules. (See Pub. Util. Code, §§ 1756-1761.) ■ Contrary to petitioners' contentions, we conclude that the rules were validly adopted and that they do not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution.

The challenged rules are set forth in full in an appendix to this opinion. They were adopted as part of the utilities' rate tariffs for the purpose of reducing bad debt losses, and they have resulted in a substantial reduction of such losses. In essence each rule provides that unless credit is established in one or another of several specified ways, an applicant must make a deposit to secure utility service. In the case of domestic service, which is the only service here involved, the PT&T rule provides for a $25 deposit, and the PG&E rule for a deposit of twice the estimated monthly charge but not less than $5. If service is terminated, the excess, if any, of the amount

of the deposit over charges due is refunded to the customer. If service is not terminated, the deposit is retained until credit is otherwise established, as it may be, for example, by the satisfactory payment for service for a period of one year. With some exceptions, the utility pays interest on the deposit.

■ Although in the past the commission has authorized the adoption of similar credit rules following public hearings (see, e.g., *Re Deposits* (1915) 7 C.R.C. 830), the rules here challenged were adopted pursuant to advice letters that set forth the justifications for the rules and that were approved without hearings by resolutions of the commission. The adoption of the rules in this way did not violate due process and was authorized by the statutes and regulations governing the commission's procedures.

■ In adopting rules governing service and in fixing rates, a regulatory commission exercises legislative functions delegated to it and does not, in so doing, adjudicate vested interests or render quasi-judicial decisions which require a public hearing for affected ratepayers. (*United States* v. *Merchants' and Manufacturers Association of Sacramento* (1916) 242 U.S. 178 [61 L.Ed. 233, 37 S.Ct. 24]; cf. *Koppers Co.* v. *United States* (W.D.Pa. 1955) 132 F.Supp. 159; and *Florida Citrus Commission* v. *United States* (N.D. Fla. 1956) 144 F.Supp. 517, affd. 352 U.S. 1021 [1 L.Ed.2d 595, 77 S.Ct. 589].)

Thus, in *Public Utilities Com'n of State of Cal.* v. *United States* (9th Cir. 1966) 356 F.2d 236, 241, certiorari denied 385 U.S. 816 [17 L.Ed.2d 54, 87 S.Ct. 35], the court rejected the claim of the California commission that due process entitled it to be heard in an informal meeting before the Federal Communications Commission, which later resulted in rate changes. The court stated that "Public utility regulation, historically, has been a function of the legislature; and the prescription of public utility rates by a regulatory commission, as the authorized representative of the legislature, is recognized to be essentially a legislative act. Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). As a ratepayer would have no constitutional right to participate in a legislative procedure setting rates, this right to be heard in a commission proceeding exists at all only as a statutory and not a constitutional right."

The Public Utilities Code does not require public hearings before rate increases or rule changes resulting in rate increases may be authorized. Section 454 of that code requires only a showing before the commission and a finding by the commission of justification for such increases. It leaves to the commission the determination of the appropriate procedures to be followed. (See Pub. Util. Code, § 701.) When proposed changes in a utility's rules result in rate increases that are minor in nature, the com-

mission's General Order No. 96-A (formerly No. 96) provides that the commission "may accept a showing" in an advice letter "provided justification is fully set forth therein, without the necessity of a formal application."

■ It bears emphasis that the fact that ratepayers have no constitutional or statutory right to a hearing before rules such as those before us are adopted in no way means that they are without a remedy to challenge the lawfulness of any such rule or its application by the utility involved. Section 1702 of the Public Utilities Code provides that such challenges may be made by complaint before the commission at any time, and section 1756 provides that the commission's decision thereon is subject to review in this court. It is pursuant to these procedures that petitioners are before us now.

We turn to the question of equal protection.

Rule 6 of the telephone company sets forth seven guidelines for establishing credit, as follows: "Each applicant for telephone service will be required to establish credit, which will be deemed established upon qualifying under any *one* of the following:

"1. Applicant is a customer of the utility or any other telephone utility in California, for a similar class of service and has paid all bills for service without having been temporarily or permanently discontinued for nonpayment thereof, for a period of twelve consecutive months immediately prior to the date of the present application.

"2. Applicant has been a customer of the utility or any other telephone utility in California in the last two years and during the last twelve consecutive months that service was provided has paid all bills for such service, without having been temporarily or permanently discontinued for nonpayment thereof.

"3. Applicant is the owner of the premises upon which the utility is requested to furnish service, or is the owner of other local real estate. . . .

"4. Applicant for resident service has been continuously employed by his present employer (including military) for a period of two years or more, or is retired on pension.

"5. Applicant furnishes a guarantor satisfactory to the utility to secure payment of bills of applicant for telephone service requested in the application. . . .

"6. Applicant's credit is otherwise established to the satisfaction of the utility.

"7. Applicant makes the deposit [of $25]."

The establishment of credit rules of PG&E are essentially the same as the foregoing rules, except that they prescribe only six modes of establishing credit and do not include rule 4.[1] Also, the amount of the PG&E deposit is fixed at twice the amount of an estimated average monthly utility bill, usually $20. Under its flexible category for establishment of credit "to the satisfaction" of the company, PG&E excepts (a) private pensioners but not social security pensioners, (b) employees of large corporations but not employees of small corporations, and (c) professionals but not nonprofessionals. PT&T likewise excepts professionals under its flexible category.

■ Petitioners take issue specifically with the three credit rules which except from the requirement of a deposit or other proof of credit (1) persons owning real property, (2) persons continuously employed by the same employer for two years, and (3) other persons able to establish credit "to the satisfaction" of the company including private pensioners, employees of large corporations, and professionals. They contend that permitting such persons to escape the deposit requirement while compelling others to pay or meet alternative credit conditions (i.e., to obtain a guarantor or show prior uninterrupted service) is a denial of equal protection.

■ In the field of economic regulation equal protection ordinarily requires only that there be a reasonable relationship between the classifications drawn and the purpose for which they are made. (See, e.g., *Rinaldi* v. *Yeager* (1966) 384 U.S. 305, 308-309.[16 L.Ed.2d 577, 579-580, 86 S.Ct. 1497]; *Dandridge* v. *Williams* (1970) 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153, 1161-1163].) Since utility service is of vital importance, however, and since the utilities' credit rules impose greater hardship on the poor who must make a deposit to secure service than on those who need not do so, petitioners contend that the classifications set forth in the credit rules can only be justified if they are essential to promote a compelling state interest. (See generally *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999], and cases cited.) In petitioners' view they cannot be so justified. They assert that the objective of reducing bad debt losses could be achieved by classifications more carefully drawn that would not discriminate against the poor merely because they are poor.

■ We reject the application of the compelling state interest test to determine the validity of the credit rules. They are in effect nothing more than a part of the utilities' rate structures. ■ The commission must fix rates that will provide a reasonable return on the utility's investment, and in doing so it has wide discretion to make rate classifications that reflect

---

[1]PG&E does except persons with one year of continuous employment, but this criterion is applied pursuant to the provision for establishment of credit "to the satisfaction of the Company."

a broad and varied range of economic considerations. (*Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 647 [44 Cal.Rptr. 1, 401 P.2d 353]; *Cal. Mfrs. Assn.* v. *Public Utilities Com.* (1954) 42 Cal.2d 530, 536 [268 P.2d 1]; *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822, 826-827 [215 P.2d 441].) The commission deals with services that are essential and the cost of which necessarily imposes greater hardship on those least able to pay. ██ To hold that because it deals with these vital interests it must justify every facet of the rate structure that may impinge upon the poor by a showing that that facet is essential to promote a compelling state interest would lead to substituting for the commission's expertise in fixing rates a court-determined standard of exquisite fairness to all ratepayers. That is not the court's business. Any doubt in this respect was dispelled by the decision in *Dandridge* v. *Williams, supra,* 397 U.S. 485-487 [25 L.Ed.2d 501-503, 90 S.Ct. 1160, 1163], in which the court firmly refused to depart from the traditional equal protection test even in the highly sensitive field of aid to needy children.[2]

██ It was for the commission to determine whether it is preferable to reduce bad debt losses by credit rules reasonably designed to do so or to spread those losses among all ratepayers by increased rates. (*Southwestern Tel. Co.* v. *Danaher* (1915) 238 U.S. 482, 490 [59 L.Ed. 1419, 1422, 35 S.Ct. 886]; *Riegel* v. *Public Utilities Commission* (1931) 48

---

[2]"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago,* 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan* v. *Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393. . . .

"It is true that in some AFDC families there may be no person who is employable. It is also true that with respect to AFDC families whose determined standard of need is below the regulatory maximum, and who therefore receive grants equal to the determined standard, the employment incentive is absent. But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test.

"We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, cer-. tainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court."

F.2d 1023 [60 App.D.C. 111], cert. den. 284 U.S. 644 [76 L.Ed. 548, 52 S.Ct. 24]; 43 A.L.R.2d 1262, 1264.) Having chosen the former alternative, the commission was obligated to determine the content of those rules. If the classifications adopted are reasonably related to the reduction of bad debt losses, they are valid, whether or not we deem that they could be improved.

In determining whether the classifications are reasonably related to their purpose we reject the invitation to consider each subcategory separately and then to look to see whether cases may be found on each side of each line which, when considered in isolation, may appear to present no significant differences with respect to credit risks. Whenever a line must be drawn, there is little that separates the cases closest to it on either side. We must consider the credit rules in the light of their overall operation.

 Examining the credit rules in their entirety, we are convinced that the commission could reasonably conclude that persons who could satisfy none of the alternative methods of establishing credit other than by making a deposit presented greater risks of bad debt losses than those who could satisfy one or more of those alternatives. Past payment of bills, ownership of real property, job stability, steady income, professional standing and ability to provide a guarantor all have some relationship to creditworthiness. Moreover, recognition of these categories together with the flexible category of establishment of credit to the utility's satisfaction necessarily serves to eliminate hardship that would in many cases otherwise be imposed upon the poor. Persons falling into those categories are not necessarily wealthy, and to invalidate those categories might as likely lead to no exceptions to the deposit requirements as to a successful quest for preferable exceptions.

 We need not pass on the utilities' administration of the category of establishing credit to their satisfaction, for no one is before us who has shown that he was denied service by an arbitrary application of that category. It is not invalid on its face, for it affords reasonable flexibility to avoid needless hardship. Moreover, anyone who believes he has been unfairly denied credit pursuant to it may always seek relief from the commission.

The order is affirmed.

McComb, J., Burke, J., Schauer, J.,* and Sims, J.,† concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

APPENDIX

PT&T's tariff provisions dealing with establishment of credit are contained in its Rules 6 and 7 which at the time of hearing were as follows:

"RULE No. 6

"ESTABLISHMENT AND RE-ESTABLISHMENT OF CREDIT

"A. Establishment of Credit

"Each applicant for telephone service will be required to establish credit, which will be deemed established upon qualifying under any *one* of the following:

"1. Applicant is a customer of the utility or any other telephone utility in California, for a similar class of service and has paid all bills for service without having been temporarily or permanently discontinued for nonpayment thereof, for a period of twelve consecutive months immediately prior to the date of the present application.

"2. Applicant has been a customer of the utility or any other telephone utility in California in the last two years and during the last twelve consecutive months that service was provided has paid all bills for such service, without having been temporarily or permanently discontinued for nonpayment thereof.

"3. Applicant is the owner of the premises upon which the utility is requested to furnish service, or is the owner of other local real estate; in the case of business service, real estate must be business property.

"4. Applicant for residence service has been continuously employed by his present employer (including military) for a period of two years or more, or is retired on pension.

"5. Applicant furnishes a guarantor satisfactory to the utility to secure payment of bills of applicant for telephone service requested in the application.

"6. Applicant's credit is otherwise established to the satisfaction of the utility.

"7. Applicant makes the deposit prescribed in Rule No. 7.

"B. Re-establishment of Credit

"1. A customer whose service has been discontinued for nonpayment of bills will be required to pay any unpaid balance due the utility for the premises for which service is to be restored and may be required to pay a reconnection charge as prescribed in Rule No. 11 under 'Restoration—Reconnection Charge' and to re-establish credit by making the deposit prescribed in Rule No. 7, before service is restored.

"2. An applicant who previously has been a customer of the utility and during the last twelve months of that prior service has had service temporarily or permanently discontinued for nonpayment of bills will be required to pay any unpaid balance due the utility, and will be required to re-establish credit by making the deposit prescribed in Rule No. 7.

"RULE No. 7

"DEPOSITS

"A. Amount of Deposit

"1. The amount of deposit required to establish credit for residential telephone service is $25.00. Whenever a deposit is taken, service connection charges and an advance payment will not be collected at the time of application.

"2. The amount of deposit required to establish credit for business telephone service is twice the estimated average monthly bill, but not less than $25.00.

"3. The amount of deposit required to re-establish credit is equal to twice the average monthly bill for the last three months, when available.

"B. Return of Deposits

"The utility will refund the deposit in accordance with the following:

"1. When an application for telephone service has been cancelled prior to the

establishment of service, the deposit will be applied to any charges applicable in accordance with the tariff schedules and the excess portion of the deposit will be returned, and the applicant will be so advised.

"2. When the customer's credit may be otherwise established in accordance with Rule No. 6, and upon the customer's request for return of the deposit with interest.

"3. Upon discontinuance of telephone service, the utility will refund, with interest the customer's deposit or the balance in excess of unpaid bills for that service, and the customer will be so advised.

"4. After the customer has paid bills for telephone service for 12 consecutive months without having had this service temporarily or permanently discontinued for nonpayment of bills, the utility will refund the deposit with interest.

"C. Interest on Deposits

"1. The utility will pay simple interest at the rate of ½ percent per month on deposits held, except as mentioned in 2. below. Such interest will be paid at the time the deposit is returned.

"2. No interest will be paid if service is temporarily or permanently discontinued for nonpayment of bills, or if deposit is held less than full month increments."

On January 28, 1969, after these cases were submitted to the commission, PT&T filed Advice Letter No. 9888, which sought authority to revise Paragraph A5 of Rule 6. The commission accepted the filing which became effective on February 28, 1969. Paragraph A5 of Rule 6 now provides:

"5. Applicant furnishes a guarantor satisfactory to the Utility to secure payment of bills of applicant for telephone service requested in the application. The amount of the guarantee shall be in the same amount as the deposit computed in accordance with Rule No. 7 and this amount shall be specified on the Guaranty Form. This guaranty shall continue in full force and effect for one year from the installation date of the service or until applicant's credit is otherwise established."

PG&E's tariff provisions dealing with establishment of credit are contained in Rules 6 and 7 of its gas and electric tariffs. The gas tariff rules are as follows:

## "RULE No. 6

### "ESTABLISHMENT AND RE-ESTABLISHMENT OF CREDIT

"(A) Establishment of Credit—Domestic Service:

"Each applicant will be required to satisfactorily establish credit which will be deemed established:

"1. If applicant is the owner of the premises to be served or of other real estate within the territory served by the Company; or

"2. If the applicant makes a cash deposit to secure payment of bills as prescribed in Rule No. 7; or

"3. If the applicant furnishes a guarantor, satisfactory to the Company, to secure payment of bills for the service requested; or

"4. If the applicant has been a customer of the Company within the past two years and during the last twelve consecutive months of that prior service has not had more than two past due bills as defined in Rule No. 11-(A); or

"5. If applicant's credit is otherwise established to the satisfaction of the Company; and

"6. If applicant has paid all bills for domestic gas service previously supplied applicant by the Company.

"(B) Establishment of Credit—Other Than Domestic Service:

"Each applicant will be required to satisfactorily establish credit which will be deemed established:

"1. If applicant is the owner with a substantial equity, of value satisfactory to the Company, in the premises to be served; or

"2. If applicant makes a cash deposit to secure payment of bills as prescribed in Rule No. 7; or

"3. If applicant furnishes a guarantor, satisfactory to the Company, to secure payment of bills for the service requested; or

"4. If applicant has been a customer of the Company for a similar type of service within the past two years and during the last twelve consecutive months of that prior service has had not more than two past due bills as defined in Rule No. 11-(A), provide that the periodic bill for such previous service was equal to at least 50% of that estimated for the new service, and, provided further, that the credit of applicant is unimpaired in the opinion of the Company; or

"5. If applicant's credit is otherwise established to the satisfaction of the Company; and

"6. If applicant has paid all bills for non-domestic gas service previously supplied applicant by the Company.

"(C) Re-establishment of Credit—All Classes of Service:

"1. An applicant who previously has been a customer of the Company and whose gas service has been discontinued by the Company during the last twelve months of that prior service because of nonpayment of bills, may be required to re-establish credit by depositing the amount prescribed in Rule No. 7 for that purpose, and by paying bills regularly due; except, an applicant for domestic service will not be denied service for failure to pay such bills for other classes of service.

"2. A customer who fails to pay bills before they become past due as defined in Rule No. 11-(A), and who further fails to pay such bills within five days after presentation of a discontinuance of service notice for nonpayment of bills, may be required, to pay said bills and re-establish his credit by depositing the amount prescribed in Rule No. 7. This rule will apply regardless of whether or not service has been discontinued for such nonpayment.

"3. A customer using other than domestic service may be required to re-establish his credit in accordance with Rule No. 6-(B) in case the conditions of service or basis on which credit was originally established have, in the opinion of the Company, materially changed.

"RULE No. 7

"DEPOSITS

"(A) Amount of Deposit:

"The amount of deposit required to establish or re-establish credit for gas service is twice the estimated average monthly bills, but in no case may the amount of deposit be less than $5.00.

"(B) Return of Deposit:

"1. Upon discontinuance of service, the Company will refund the customer's deposit or the balance in excess of the unpaid bills for gas service furnished by the Company.

"2. After the customer has paid bills for service for twelve consecutive months without having had more than two past due bills, as defined in Rule No. 11-(A), the Company will refund the deposit. If the customer has had more than two past due bills, the Company will thereafter review the account every twelve months and will refund the deposit after the customer has not had more than two past due bills during the twelve months prior to any review.

"3. The Company may return the deposit at any time upon request, provided the customer's credit may otherwise be established in accordance with Rule No. 6.

"(C) Interest on Deposit:

"The Company will pay interest on deposits at the rate of 5% per annum for the first twelve consecutive months during which a customer has paid bills for service without having had more than two past due bills as defined in Rule No. 11-(A) and

for the additional time thereafter up to the date of refund or the date upon which a check is mailed to the customer.

"No interest will be paid if service is discontinued or if the deposit is returned before twelve months from date on which deposit was made."

PG&E's electric tariff Rules 6 and 7 are identical to those in its gas tariff.

**MOSK, J.**—I dissent.

Public utilities have required some form of deposits since 1915 under purported standards comparable to those still used today and they understandably find it convenient to maintain the status quo. Thus the companies, and the Public Utilities Commission which approves their rules, appear genuinely perplexed when 56 years later a class of frustrated potential ratepayers question the validity of the current deposit requirement. The failure of the utilities and the commission is to take cognizance of two significant developments in the law during the past half century: the numerous constitutional decisions to prevent invidious discrimination in our society and the emergence of an innovative poverty law designed to assure the viability of our economic system.[1]

Petitioners desire to be consumers of telephone and gas and electric service and thus seek review of decision No. 76065 of the Public Utilities Commission which approved the "establishment of credit" rules of the Pacific Telephone and Telegraph Company (PT&T) and the Pacific Gas and Electric Company (PG&E). Petitioners contend that three of the rules create exceptions to the requirement of a cash deposit or other proof of

---

[1]The public policy of the United States was stated in the preamble to the Economic Opportunity Act of 1964 (42 U.S.C. § 2701): "Although the economic well-being and prosperity of the United States have progressed to a level surpassing any achieved in world history, and although these benefits are widely shared throughout the Nation, poverty continues to be the lot of a substantial number of our people. The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society. It is, therefore, the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity."

"Justice in a society such as ours, a society marked by wide differences in wealth and power, requires a legal system that compensates for these differences. The law is above all a means of creating and protecting rights. What is so necessary is an enlarged conception of the rights of the poor and a changing conception of the role of law in providing, protecting and implementing these rights. We must disabuse ourselves of the myth that poverty is somehow caused by the poor. We must recognize that the law often contributes to poverty. We must understand that whereas the law for most of us is a source of rights, for the poor the law appears always to be taking something away. That we have to change. And those of us who have been given the temporary custody of our laws by the people must ensure that those laws and our courts treat all equally—rich and poor alike." (Address, Justice for the Poor, by John N. Turner, Minister of Justice and Attorney General of Canada, North American Judges Association Conference, San Francisco, Dec. 1, 1969.)

credit which violate the equal protection clause of the Fourteenth Amendment. I agree, and am convinced that the Public Utilities Commission decision should be annulled.

The credit rules are set forth in the majority opinion and need not be repeated. Petitioners take issue specifically with the three credit rules which except from the requirement of a deposit or other proof of credit (1) persons owning real property, (2) persons continuously employed by the same employer for two years, and (3) other persons able to establish credit "to the satisfaction" of the company, which category in practice includes private pensioners, employees of large corporations, and professionals. Petitioners contend that permitting such persons to escape the deposit requirement while compelling others to pay or meet alternative credit conditions (i.e., to obtain a guarantor or show prior uninterrupted service) is a denial of equal protection.

The majority of this court abdicate their responsibility to analyze the suspect categories by declining "to consider each subcategory separately" (*ante,* p. 296) and by merely painting with a broad brush characterized as "overall operation" of the rules. (*Ante,* p. 296.) The commission was obligated to consider each category separately, and there is no reason why this court should not do so on review. I can sympathize with the reluctance of the majority to face the issues raised by the petition, for the task of rationalizing the purported distinctions is obviously insurmountable. But sweeping the problem under the rug is unsatisfactory to the petitioners and unrewarding to the utilities which need appropriate guidance. Since the majority fail to meet the issues squarely, I shall undertake to do so.

In its least stringent application, equal protection of the laws requires a reasonable relation between classifications drawn under color of state law and the purpose for which the classifications are made. (See, e.g., *Rinaldi* v. *Yeager* (1966) 384 U.S. 305, 309 [16 L.Ed.2d 577, 580, 86 S.Ct. 1497].) The conceded purpose of the classifications within the telephone and gas company credit rules approved by the Public Utilities Commission is to reduce the bad debt losses of the companies by requiring a deposit from persons likely to be bad credit risks. Therefore, applying the traditional test of equal protection to the first two disputed credit classifications, the issue is whether there is a sufficiently rational correlation between land ownership or job stability and financial reliability, and conversely between lack of both land ownership and job stability and financial unreliability, so as to justify the imposition of more onerous economic requirements on persons without land and persons who change jobs.

It is clear that the two classifications are not necessarily related to credit reliability. A person of low income, who lives in rented lodgings and has

not been at his job for two years, is often an excellent credit risk but he nonetheless may be required to make a cash deposit or meet other stringent credit requirements. If his income is such that he can afford modest monthly utility bills but not one or two $20 or $25 lump-sum deposits, he might be denied access to telephone or gas and electric service, or both. Therefore, the classification of nonlandowners and of persons without two years' continuous employment is overinclusive with respect to its purpose of weeding out dangerous credit risks.[2]

But the classification is also underinclusive with respect to its purpose because many owners of land and many persons with job stability might nevertheless be poor credit risks.[3] While financial resources are the primary requisite for land ownership, some persons with such resources are profligate and not necessarily responsible in meeting their financial obligations. As to mobility, a tenant with a term lease might be a more stable prospect than a property owner, especially if the latter's equity is minimal. Job stability, though perhaps more closely related to credit reliability, is still an imprecise measure. Many factors unrelated to credit responsibility—such as ambition and advancement—might influence one man to change jobs and another to stay at the same position for two or more years. In short, the utilities appear to confuse ability to pay with credit reliability. Both land ownership and employment may be tangentially related to one's ability to pay, but do not necessarily indicate that a person will be willing to pay his bills and hence be a good credit risk. If ability to pay is the relevant criterion, the utilities should have credit rules based entirely on gross income.

Because land ownership and job permanency are pragmatically related to income and race, the effect of the application of these empirically unsupported presumptions of credit reliability and unreliability is to impose the heaviest burden of the deposit requirement on the disadvantaged and the poor, while more affluent persons who may be credit risks are excepted. The anomalous result is that the poor who are users of utility services may

---

[2]Although discussing merchandise, rather than public utility services, Professor Dodyk, et al., in their book, Law and Poverty (1969) at pages 837-838, conclude that "Many low-income familes are quite capable of making regular payments. . . . Moreover, perhaps general market retailers can take steps to make it easier for low-income families to apply for and receive credit. Some retailers have already found that they can do so economically. Various community business organizations might consider ways of more actively encouraging low-income families to seek credit. . . .

"Increased competition for the patronage of low-income consumers would go a long way toward resolving many of the problems confronting them in the low-income market. Public policy should consider the various ways by which new entrants could be encouraged into these markets . . . ."

[3]With all its vast multi-state resources, the Penn Central Railroad, currently in receivership, is less likely to pay utility bills for its California offices promptly and in full than the neighborhood grocer.

be subsidizing others by bearing more than their fair share of the cost of bad debt losses through their involuntary payment of short-term, low interest capital in the form of cash deposits to the utility companies.[4]

As stated by a recent commentator, referring to credit rules similar to those at issue in the case at bar: "Whether reliance on such crudely-defined categories reflects a belief that some groups never default, a fear that they would not tolerate the additional charge, or merely administrative convenience, these criteria hardly isolate with any precision those customers likely to default in payment of their utility bills. . . . [B]ecause of the deposit practices of many utilities, bad risks in the higher income groups pay no deposits while perfectly reliable users in lower-income must either deposit cash, undertake the often difficult task of proving their creditworthiness, or do without the utility's service." (Note, *Public Utilities and the Poor: The Requirement of Cash Deposits from Domestic Consumers* (1969) 78 Yale L.J. 448, 457-458.)

The commission, in sustaining the validity of the utilities' establishment of credit rules, relied on evidence showing that utilities' bad debt losses had been substantially reduced after they had instituted the rules. However, the fact that a deposit requirement imposed on persons not owning property and lacking job stability reduces bad debt losses does not demonstrate that land ownership and job stability are rationally related to credit reliability. As the utilities' representatives admitted, a deposit requirement imposed on any group at random would reduce bad debt losses, perhaps to the same extent that the losses were reduced by the requirement imposed on persons without land and job stability. Without evidence to the contrary, it must be conceded that a deposit requirement imposed, for example, on the owners of real property might also reduce the bad debt losses incurred by the utility companies.

The commission's decision refers us to a 1966 survey conducted by PT&T. The study involved 16,711 final accounts which had been written off as uncollectible during a 30-day period. Of this number, information as to customer background was unavailable in 5,556 cases. In the remaining group of uncollectible accounts, the statistics showed that 93 percent rented their living quarters and 71 percent had less than two-year job stability. From these figures, the commission deduced that persons who did not own

---

[4]Both PT&T and PG&E rules provide for the return of the deposits to the customers after one year of continuous service without disconnection. PT&T pays interest at the rate of one-half of 1 percent per month and PG&E pays 5 percent per year.

PT&T presented evidence that it collects approximately $3,000,000 in deposits from over 100,000 customers annually. Although this amount may constitute but a fraction of the total revenues of PT&T, $3,000,000 is nonetheless a sizeable sum acquired at minimal interest cost.

land or remain at their jobs for two years were poor credit risks while persons with land or job stability were reliable. Hence, the commission concluded that the utilities' credit rules were reasonably related to the reduction of bad debt losses.

The problem with the commission's analysis is that the statistics relied upon are meaningless without related figures indicating the percentage of PT&T's total number of ratepayers who rented their dwellings and had not remained at their latest jobs for two years. For example, if 71 percent of the total number of telephone company ratepayers held their jobs for less than two years, the fact that 71 percent of the uncollectibles also reflected that characteristic would lack significance.

The third contested credit classification excepts persons who establish credit "to the satisfaction" of the utility from the requirement of paying a deposit or otherwise establishing credit. If the first two classifications devised by the utilities to distinguish between good and bad credit risks are crudely defined, the third is not only impermissibly vague but its admitted application is wholly incomprehensible. As applied by the utilities, this third classification distinguishes between private and social security pensioners, employees of large and small corporations, and professionals and nonprofessionals. Neither the telephone company, the gas and electric company, or the commission offer any explanation to justify the distinctions drawn between private and social security pensioners and between employees of large and small corporations. No evidence is offered to show that the decision to favor one group over the other was even remotely related to the avowed purpose of the credit rules: to isolate bad credit risks and require them to pay a deposit or meet other requirements. As applied by the utilities, the rules might require a social security pensioner with an excellent credit background to pay a deposit, while a private pensioner with a history of irresponsibility would be excepted. The commission has suggested no defensible justification for distinguishing between utility customers on the basis of the size of their corporate employers or the source of their pension checks, when the stated purpose is reduction of bad debt losses. The application of this credit rule is wholly devoid of reason, and any effort to sustain it would be stultifying. The majority of this court, understandably, make no effort to conjure up a rationale for this classification.

The commission suggests some basis for differentiating between professionals and nonprofessionals. Professionals, who must meet extensive training and licensing requirements in order to practice within the state, are likely to remain here, the commission explains. Although it may be true that professionals as a group are less likely to leave the state, the classification is, at best, only marginally related to credit reliability. A party likely to remain within the state will be available to legal process, but he is not

necessarily a good credit risk. Furthermore, the fact that many professionals are self-employed would seem to be an offsetting factor, since the income of a salaried employee is less likely to fluctuate and is more accessible to creditors.

Applying the traditional test of equal protection, I believe that the first two classifications based on land ownership and job stability are of doubtful constitutionality, while the application of the third is a clear violation of equal protection. But petitioners argue persuasively that a more stringent test of equal protection than the rationality requirement should be applied to the land ownership and job stability classifications.

It has become commonplace constitutional doctrine that "suspect classifications" and classifications affecting fundamental interests are subject to "special scrutiny" by the courts, and these classifications are sustained only if they are shown to be necessary to promote compelling governmental interests. (See, e.g., *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634, 638, 660 [22 L.Ed.2d 600, 615, 617, 630, 89 S.Ct. 1322]; *Williams* v. *Rhodes* (1968) 393 U.S. 23, 30-31 [21 L.Ed.2d 24, 31-32, 89 S.Ct. 5]; *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541-542 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 235-244 [85 Cal.Rptr. 20, 466 P.2d 244]; Note, *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1120-1131.) Petitioners contend that the utilities' classifications must meet a compelling interest test because they are based on the suspect criterion of wealth and because they impair the fundamental interest of persons to obtain service from government-regulated utilities without meeting arbitrary preconditions.

In *Harper* v. *Virginia Bd. of Elections* (1966) *supra,* 383 U.S. 663, 668 [16 L.Ed.2d 169, 173], the United States Supreme Court made it abundantly clear that "[l]ines drawn on the basis of wealth or property, like those of race [citation], are traditionally disfavored." (Also see *Lee* v. *Habib* (1970) 424 F.2d 891, 898 [137 App.D.C. 403].) And in *McDonald* v. *Board of Election* (1969) 394 U.S. 802, 807 [22 L.Ed.2d 739, 744, 89 S.Ct. 1404], the court reiterated that "a careful examination on our part is especially warranted where lines are drawn on the basis of wealth or race [citation], two factors which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny." Petitioners contend that classifications based on land ownership and job stability are fundamentally grounded on differences in wealth. Indeed, both land and employment are, in essence, sources of wealth, and land ownership cannot be achieved without the acquisition and expenditure of

financial resources. Thus, the disputed credit rules may be viewed as tests of wealth rather than of financial responsibility.

I must assume that the commission would have invalidated the exceptions to the deposit requirement for landowners and persons with job stability if it had judged them by the standard applicable to classifications based on wealth. Neither classification could be demonstrated to be necessary to promote a compelling interest. The classifications are both over and under-inclusive and their burden falls upon the poor generally rather than upon bad credit risks specifically. To justify the discriminatory effect of the classifications, the utilities would have had to show that the interest in reducing bad debt losses was compelling and that other means less violative of the equal protection clause were not available. Neither of these showings could have been made. Most businesses treat bad debt losses as one of the inevitable costs of doing business and spread the loss among their paying customers.[5] The utilities could do likewise with only slight burden, if any, to their ratepayers. Furthermore, even if reduction of bad debt losses were deemed a compelling interest, the utilities can achieve the result through other means less likely to discriminate against the poor. For example, utilities might require bad credit risks who have a history of default to pay their utility bills more frequently than other ratepayers; or, if the companies preferred a deposit requirement, the requirement could be limited to those customers with a previous history of unreliability in paying utility bills.

Petitioners contend also that the utility companies' classifications fall within the second prong of the compelling interest standard—the classifications affect the fundamental interest of persons to enjoy equal access to utility service. In *Harper* v. *Virginia Bd. of Elections* (1966) *supra,* 383 U.S. 663, the Supreme Court recognized a fundamental interest in the franchise even though there was no constitutional right to vote in state elections, and the court viewed the poll tax with "special scrutiny." I do not suggest that utility services are equal to the voting franchise in priority,

---

[5]We live in a society in which consumer credit is a major economic factor. At the end of 1945 consumer credit amounted to $5.6 billion; by 1967 the total amount was estimated at $92.5 billion. The growth has been four and a half times greater than the growth rate of our economy as a whole. (Dodyk, et al., Law and Poverty (1969) p. 819.) It seems strange that most commercial enterprises extend longer credit than utilities and few, if any, require cash deposits. Yet utilities operate with government-regulated rates assuring them of a profit.

Most businesses find expanding consumer credit to be rewarding. "Bank of America has about $2.6 billion in instalment credit outstanding, or approximately 17 per cent of its loan portfolio. These loans have a high rate of repayment—about $400 million per month. They are good income producers and have had a remarkably low loss record—less than one quarter of one per cent since the bank entered the consumer credit field in 1929." (BankAmerica Corporation Annual Report 1970, p. 12.)

but such services are necessaries of life in this mechanized age.[6] In *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 255 [53 Cal.Rptr. 673, 418 P.2d 265], we recognized that telephone service is an "essential means of communication for which there is no effective substitute" and that access to telephone service affects freedom of speech. And in *City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App. 2d 105, 129 [22 Cal.Rptr. 216], the court noted that "a public utility is the dedication of property to a public use. . . . ' "Public use . . . means the use by the public and by every individual member of it, *as a legal right." ' "* Therefore, classifications affecting the access of the poor to utility service should be viewed with "special scrutiny," given that the right to utility service is essential and that the denial of access inflicts hardship on those deprived. "The right to public utility services may not rank with the franchise, or with procedural due process in criminal cases, on a conventional scale of liberties, but to the poor nothing may be more immediately important than fair treatment by those who supply the needs of their daily existence." (Note (1969) *supra,* 78 Yale L.J. 448, 463.)[7]

Classifications based on land ownership and job stability are not to be viewed with the same suspicion as those based, for example, on race. Nor do I believe that the interest in equal access to utility services is deserving of the same protection as the right to vote or the constitutionally protected right to procedural due process in criminal cases. Nevertheless, the classifications before us involve both the suspect criterion of wealth and the crucial interest of persons in equal access to utility service. This combination of factors should compel "special scrutiny."

In a recent examination of the requirements of equal protection, the

---

[6]Petitioner Wood, a 76-year-old pensioner, testified before the commission and described the hardships he suffered while without utility service: "[T]here was no heat so I went to bed early. I had my own bed clothing, and after having had quite a bit of experience with cold weather, I took a small blanket and put it over my head like a parka. . . . I ate some cold lunches. And there are a few greasy-spoon restaurants around that neighborhood so that is how I lived."

A social worker testified with regard to telephone service: "I had one woman who lay on the floor for two days with a broken leg because nobody came in to check to find out why she hadn't been seen or heard from. If there had been a phone, they might have been able to."

[7]Seeking to articulate a general formula to distinguish "fundamental interests" from others for purposes of the equal protection clause, a commentator has recently suggested "that a common thread can be found in the severity of the detriment imposed on a complaining party in 'fundamental interest' cases." (Note (1969) *supra,* 82 Harv.L.Rev. 1065, 1130.) Applying that test to a person unable to qualify under the utilities' credit rules and unable to afford the lump-sum deposit, it may well be that deprivation of utility service is a detriment so severe that the right to equal access to utility service is a "fundamental" right. (Cf. *Allen* v. *Railroad Commission* (1918) 179 Cal. 68, 88 [175 P. 466, 8 A.L.R. 249].)

Supreme Court subjected state welfare residency requirements to "special scrutiny," despite the absence of both a traditionally suspect basis of classification and a "fundamental" interest normally placed in the highest rank. In *Shapiro* v. *Thompson* (1969) *supra,* 394 U.S. 618, 634 [22 L.Ed.2d 600, 615], the court explicitly rejected a rationality test solely because the residency requirements imposed by the states affected the right of persons to travel from state to state. We would not broaden the application of "special scrutiny" in the instant case were we to apply it to utility company classifications founded on wealth and affecting the ability of persons to acquire modern day necessities of life.

For the foregoing reasons, I am convinced that the contested credit rules do not meet the standards imposed by the equal protection clause. The subclassifications erected in the application of the flexible category for credit established "to the satisfaction" of the utilities are not rationally related to the avowed purpose of the credit rules; consequently, these subclassifications constitute an invidious discrimination against social security pensioners, employees of small corporations, and nonprofessionals. The other two classifications, imposing more stringent credit requirements on persons not owning land and lacking two-year job stability, are of doubtful constitutionality under a rationality test and clearly unconstitutional when subjected to "special scrutiny." Therefore, the commission's decision sustaining the validity of the utilities' credit rules should be annulled.

In disapproving certain credit rules on equal protection grounds, I would not impose an "all-or-nothing" approach on the utility companies. A deposit need not be exacted from every utility customer, or not at all, in order to pass constitutional analysis. The Public Utilities Commission, in protecting the public interest, should require only that credit rules, if any, bear a significant relationship to the purposes sought to be achieved by the imposition of the rules. If the object is to isolate bad credit risks and to require only from them deposits or other proof of credit reliability, the classifications established to achieve the purpose must be defined with sufficient precision to avoid invidious discrimination in the imposition of credit burdens and benefits.

Peters, J., concurred.

Petitioners' application for a rehearing was denied April 29, 1971. Tobriner, J., and Sullivan, J., did not participate therein. Schauer, J.,* and Sims, J.,† participated therein. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.