[No. C008372. Third Dist. Sept. 20, 1991.]

SACRAMENTO CABLE TELEVISION et al., Plaintiffs and Appellants, v. CITY OF SACRAMENTO et al., Defendants and Respondents.

## COUNSEL

Downey, Brand, Seymour & Rohwer, J. Keith McKeag, Stephen J. Meyer, Dan L. Carroll, Baker & Hostetler and John B. Moorhead for Plaintiffs and Appellants.

Cooper, White & Cooper, John M. Ross, Peter W. Michaels, Martin Kassman, Jonathan K. Sobel, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Frank W. Lloyd III, Diane B. Burstein, Caroline O. Roberts, Spencer R. Kaitz, Alan J. Gardner, Carrington F. Phillip and Jeffrey Sinsheimer as Amici Curiae on behalf of Plaintiffs and Appellants.

James Jackson and Sharon Siedorf Cardenas, City Attorneys, Theodore H. Kobey, Jr., Assistant City Attorney, Adams, Duque & Hazeltine, Richard R. Terzian and Margaret L. Oldendorf for Defendants and Respondents.

## OPINION

**PUGLIA, P. J.**—Plaintiffs Sacramento Cable Television (SCT) and Christine Barney appeal from a judgment dismissing their challenge to a tax

imposed by defendant City of Sacramento (City) on users of cable television service. Plaintiffs contend the tax violates both the First Amendment to the United States Constitution and the franchise agreement between City and SCT. The trial court granted summary judgment to defendants, concluding the tax, which also applies to telephone, gas, and electric utilities, is one of general applicability and is rationally based. We shall affirm.

I

SCT is a California partnership engaged in the business of supplying cable television service. SCT supplies over 99 percent of the cable television service within City pursuant to a nonexclusive franchise agreement between City and SCT. Plaintiff Christine Barney is a resident of City and a subscriber to the cable television services of SCT. Defendant Michael Medema is the City revenue manager.

SCT's service is transmitted to subscribers from a central location through coaxial cables which are either attached to public utility poles, placed in conduits located in property owned by public utilities or over which public utilities have an easement, or placed in City street rights-of-way. The original grant of a cable franchise to SCT is embodied in a resolution of the Sacramento Metropolitan Cable Television Commission and City Ordinance No. 81-103, which added chapter 20 to the City Code. Section 20.600 of the City Code requires SCT to pay franchise fees to City "[f]or the use of the streets and for the purposes of providing revenue with which to defray the costs of regulation arising out of issuance of franchises . . . and promoting, assisting and financing community use programming and other cable services of a public character."

The relationship between SCT and City is also governed by Ordinance No. 88-076, which amended portions of Ordinance No. 81-103. Section 8.01 of the franchise resolution and amended franchise ordinance provides in part: "this Amended and Restated Resolution shall operate to preclude the Public Entities from imposing any monetary or property obligation on the Franchise Entities based on their being cable companies or cable television operators, or on their subscribers by reason of their status as such, excepting any tax, fee or assessment of general applicability."

City imposes a sales tax of 1 percent on the sale of tangible personal property (City Code, § 41.15) and a comparable use tax on the use of tangible personal property (City Code, § 41.16). This includes books, videotapes and audiotapes but does not include newspapers, periodicals, radio transmission, single channel distribution systems, satellite master antenna

systems, or multipoint microwave distribution systems. City imposes a 5 percent tax on the price of admission to live entertainment events where the price exceeds $10 and to closed circuit transmission of live entertainment events. (City Code, § 41.92.)

Prior to enactment of Ordinance No. 89-047, article VI of the City Code (§ 41.50 et seq.) imposed a utility users tax of 7½ percent on the use of telephone, gas, and electric service. This tax is paid by the user of the service. Ordinance No. 89-047 amended various sections of article VI and added section 41.54-2, which imposes the same 7½ percent tax on the use of cable television service. Neither SCT nor its subscribers, nor the providers or customers of telephone, electric or gas service are subject to either the City's sales or use tax.

SCT filed this action seeking declaratory and injunctive relief to prohibit enforcement of the utility tax on cable television service. The matter was submitted on cross motions for summary judgment, a stipulation of undisputed facts, and declarations. On December 12, 1989, the trial court granted defendants' motion as previously indicated. Judgment of dismissal was entered December 28, 1989.

## II

█ The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, prohibits the enactment of any law "abridging the freedom of speech, or of the press . . . ." (*Douglas* v. *Jeannette* (1943) 319 U.S. 157, 162 [87 L.Ed. 1324, 1328, 63 S.Ct. 877].) This limitation applies to municipal ordinances. (*Lovell* v. *Griffin* (1938) 303 U.S. 444, 450 [82 L.Ed. 949, 952, 58 S.Ct. 666].) █ Disseminators and subscribers of cable television service are engaged in protected First Amendment "speech" and are therefore entitled to protection. (*Leathers* v. *Medlock* (1991) 499 U.S. __ [113 L.Ed.2d 494, 111 S.Ct. 1438] (hereafter *Leathers*); *Los Angeles* v. *Preferred Communications, Inc.* (1986) 476 U.S. 488, 494-495 [90 L.Ed.2d 480, 487, 106 S.Ct. 2034].)

█ However, the First Amendment does not insulate the press from taxation. "The state has the power to enact statutes which impose taxes on all businesses, including the press, in order to generate revenue so long as those laws operate evenhandedly upon all similarly situated. [Citation.]" (*Times Mirror Co.* v. *City of Los Angeles* (1987) 192 Cal.App.3d 170, 179 [237 Cal.Rptr. 346] (hereafter *Times Mirror*).) It is only when a taxing scheme singles out protected speakers or differentiates between protected speakers

and others or among protected speakers that First Amendment concerns arise.

For example, in *Minneapolis Star* v. *Minnesota Comm. of Rev.* (1983) 460 U.S. 575 [75 L.Ed.2d 295, 103 S.Ct. 1365], a tax on the use by newspaper publishers of ink and paper was found to implicate First Amendment rights both because it singled out the press for different tax treatment and because it differentiated among First Amendment speakers. Not only did the tax apply solely to newspapers but it exempted the first $100,000 of ink and paper used, thereby singling out only a few large newspapers to bear the full burden of the tax.

In *Festival Enterprises, Inc.* v. *City of Pleasant Hill* (1986) 182 Cal.App.3d 960 [227 Cal.Rptr. 601], the Court of Appeal found an admissions tax, which effectively applied only to the two movie theaters run by the plaintiff, raised First Amendment considerations despite the broader wording of the ordinance creating the tax. Similarly, in *United Artists Communications, Inc.* v. *City of Montclair* (1989) 209 Cal.App.3d 245 [257 Cal.Rptr. 124], an admissions tax, 90 percent of the burden of which fell on two movie theaters operated by the plaintiff and two adult bookstores, was found to implicate the First Amendment.

■ "The danger from a tax scheme that targets a small number of speakers is the danger of censorship; a tax on a small number of speakers runs the risk of affecting only a limited range of views. The risk is similar to that from content-based regulation: it will distort the market for ideas. 'The constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.' [Citation.]" (*Leathers, supra,* 499 U.S. at p. __ [113 L.Ed.2d at p. 505].)

■ Where a taxing scheme targets First Amendment speakers, it will be upheld only if the taxing entity demonstrates the scheme is necessary to serve a compelling interest which cannot be achieved by more general taxation. (*Minneapolis Star, supra,* 460 U.S. at p. 585, fn. 7 [75 L.Ed.2d at p. 305].) In *Minneapolis Star* the only justification given for the discriminatory ink and paper tax was raising revenue. Because such interest could have been served as well by a more general tax which did not single out protected speakers, the court held it insufficient justification. (460 U.S. at pp. 582-585 [75 L.Ed.2d at pp. 303-305].)

■ Plaintiffs contend the tax here in question implicates First Amendment considerations because it treats cable television differently from other protected speakers and because it singles out SCT, which provides 99 percent of the cable service in the City. Therefore, according to plaintiffs, the sole basis for enactment of the tax, revenue generation, is insufficient justification and the tax must be struck down.

Were the tax here one imposed solely on cable television we might agree it cannot withstand constitutional scrutiny. Individualized treatment, which threatens individualized *mis*treatment and the consequent suppression of ideas, is at the heart of First Amendment concerns. (*Minneapolis Star, supra*, 460 U.S. at p. 588 [75 L.Ed.2d at p. 307].) But the tax here is broader. Although referred to in Ordinance No. 89-047 as a "cable television use tax," the actual tax in issue is City's utility users tax (City Code, § 41.50 et seq.) which covers as well the use of telephone, gas and electric service. Ordinance No. 89-047 did not create a new tax but merely expanded the coverage of an existing one. It is this overall tax, and how it fits into the framework of City's tax scheme, with which we are concerned. The relevant question is not whether City could single out cable television but whether it could classify cable television for purposes of taxation with the three enumerated utilities.

■ "Inherent in the power to tax is the power to discriminate in taxation. 'Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.' [Citations.]" (*Leathers, supra*, 499 U.S. at p. __ [113 L.Ed.2d at p. 506].) "There is nothing unconstitutional about treating [particular First Amendment speakers] as a separate class for tax treatment so long as 'the purpose of imposing taxes is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation . . . .' [Citations.]" (*Festival Enterprises, Inc.* v. *City of Pleasant Hill, supra*, 182 Cal.App.3d at pp. 963-964.) "[D]ifferential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." (*Leathers, supra*, 499 U.S. __ [113 L.Ed.2d at p. 507].)

In *Times Mirror* the Court of Appeal upheld a taxing scheme which treated different categories of First Amendment speakers differently. The tax was broad based, applying to First Amendment and non-First Amendment entities, and treated all entities within each class equally. Regarding the various classifications within the taxing scheme, the court indicated: "The classifications created by the City's taxing scheme are anything but arbitrary or unreasonable. . . . [N]ewspapers and other periodicals are classified as

'goods, wares, or merchandise' while publishing and printing are categorized as 'manufacturing.'

"These various distinctions flow naturally from differences in the methods and procedures used in conducting the business activities subject to the ordinance and thus afford an acceptable basis for imposing disparate rates of taxation. (See *Alco Plating Corp.* v. *City of Los Angeles* (1974) 39 Cal.App.3d 948, 951-952 [114 Cal.Rptr. 506].) Within each broad classification, however, all businesses are taxed similarly.

"Even a cursory review of the law reveals that all members of the press are treated alike; that the press and all other publishing enterprises are treated similarly; and that all publishing enterprises are treated identically with other wholesalers and retailers. The City has not created an artificial class of businesses in order to tax some who are engaged in the same business and not others." (*Times Mirror*, 192 Cal.App.3d at p. 184.) The court concluded compelling justification for the taxing scheme was unnecessary because the tax did not result in any discriminatory burden on First Amendment rights. (*Id.* at pp. 182-183.)[1]

In its recent *Leathers* decision, the United States Supreme Court considered a challenge similar to that presented in this case. In 1987 the Arkansas Legislature amended its gross receipts tax to impose a 4 percent sales tax on cable television. Exempted from this tax were newspapers, magazines, and satellite broadcast services. Viewing the tax scheme as a whole, the court found it did not single out cable television or the press because it also covered such services as "natural gas, electricity, water, ice and steam utility services; telephone, telecommunications, and telegraph service; the furnishing of rooms by hotels, apartment hotels, lodging houses, and tourist camps; alteration, addition, cleaning, refinishing, replacement, and repair services; printing of all kinds; tickets for admission to places of amusement or

---

[1]Amicus curiae California Cable Television Association contends *Times Mirror* is inapposite because the court engaged in an equal protection analysis instead of that required for a First Amendment challenge. The court in *Times Mirror* referred to the plaintiffs' challenge as one "couched in terms of equal protection" (*supra*, 192 Cal.App.3d at p. 182) and applied a rational basis test to the classifications created by the tax in question. However, the court expressly concluded "the tax rate distinctions which may exist between different members of the media and between the media and other taxpayers are constitutionally permissible and in no way impinge on the exercise of plaintiffs' rights under the First Amendment." (*Id.* at p. 185.) First Amendment analysis requires heightened scrutiny only where the taxing scheme singles out or discriminates against First Amendment speakers. (*Id.* at p. 183.) The court used a rational basis test only to determine if the tax in question discriminated against First Amendment speakers. Only where no rational basis exists for the classification used will a discrimination be found. There being no such discrimination in *Times Mirror*, there was no need to find a compelling interest to justify the tax.

athletic, entertainment, or recreational events; and fees for the privilege of having access to or use of amusement, entertainment, athletic, or recreational facilities." (499 U.S. at p. ___ [113 L.Ed.2d at p. 504].)

Despite the differential treatment of cable television, the court found no First Amendment violation because there was no evidence of discrimination on the basis of ideas. (*Leathers, supra,* 499 U.S. at p. ___ [113 L.Ed.2d at p. 508].) As described by the court: "The Arkansas Legislature has chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment." (499 U.S. at p. ___ [113 L.Ed.2d at p. 508].)

City here imposes a 1 percent tax on the sale or use of tangible personal property. This tax is imposed on books, video- and audiotapes, and most periodicals. It is not imposed on the sale of newspapers. City imposes a 5 percent tax on the admission price of certain live entertainment events priced at greater than $10 and closed-circuit transmission of live events. Users of telephone, gas and electric utility services are taxed at a rate of 7½ percent. By virtue of Ordinance No. 89-047, this 7½ percent tax also applies to cable television.

Plaintiffs contend no rational basis exists for including cable television in the otherwise general utility users tax because cable television is not a utility and because SCT already pays amply for use of public easements and utility structures. Defendants counter that the grouping of cable television with the three utilities is justified by the similar methods of distribution and other similarities in the services. We find defendants' argument the more persuasive.

Cable television is not a "utility" as that term is defined in the Public Utilities Code. (Pub. Util. Code, § 216; *Orange County Cable Communications Co.* v. *City of San Clemente* (1976) 59 Cal.App.3d 165, 170 [130 Cal.Rptr. 429].) Nevertheless, much like telephone, gas and electric service, cable television service is transmitted to customers through structures located in or on public easements created expressly for utility access. Surplus space on support structures owned by public utilities has in fact been dedicated to cable television for this purpose. (See Pub. Util. Code, § 767.5, subd. (b).) Cable television operators, like public utilities, are regulated by

the Public Utilities Commission with respect to the operation and construction of facilities and equipment to ensure health and safety of employees, customers, and the public. (Pub. Util. Code, §§ 768, 768.5.) Cable television operators are also subject to certain regulations and restrictions regarding services and rates.[2] There is clearly a significant degree of commonality among these four services.

By arguing the use of public easements and utility structures cannot support classifying cable television with public utilities because such use is paid for through franchise and other fees, plaintiffs confuse the basis for the *classification* with the basis for the *tax*. The basis for the utility users tax is not the use of easements and support structures but City's need to raise revenue. The use of public easements and other indicia of a public utility are not the basis for the tax but the basis for grouping cable television with the three utilities which transmit their services in a similar fashion. It is the basis for the *classification* of businesses with which we are initially concerned. If this basis is rational, then the basis for the tax on the entire class need only be rational. Only if no rational basis exists for the classification, i.e., the tax is discriminatory, must there be a compelling basis for structuring the tax in this way.

Like the classification of newspapers and periodicals as "goods, wares, or merchandise" and publishing and printing as "manufacturing" in *Times Mirror* and the classification of cable television differently from other media in *Leathers*, the grouping of cable television with the three utilities here is rationally based. This is not an arbitrary grouping designed to punish cable television but instead flows naturally from similarities in the businesses involved.

Plaintiffs contend the tax is nevertheless discriminatory because 99 percent of its burden falls on SCT customers. Regardless of its design or intent, a tax must be tested for First Amendment purposes "by its operation and effect." (*Near* v. *Minnesota* (1931) 283 U.S. 697, 708 [75 L.Ed. 1357, 1363-1364, 51 S.Ct. 625, 628]; *United Artists Communications, Inc.* v. *City of Montclair, supra,* 209 Cal.App.3d at p. 253.) However, plaintiffs again misunderstand the nature of the tax in question. The relevant effect is not the percentage of cable television tax paid by SCT subscribers but the percentage of the overall utility users tax paid by SCT customers. The record here is

---

[2]Cable television operators are subject to limited regulations regarding rates and channels (Gov. Code, § 53066.1), providing service to everyone regardless of income of the residents of a particular area (Gov. Code, § 53066.2), availability of lockboxes for subscribers (Gov. Code, § 53066.4), and receipt of unwanted signals (Gov. Code, § 53066.5).

silent on the amount of tax paid for the use of telephone, gas and electric service.

Plaintiffs also contend the tax is discriminatory because it does not encompass all utilities or all services using public rights-of-way and imposes a 7½ percent tax while other taxes on First Amendment speakers are much lower. However, perfection in a taxing scheme has never been a prerequisite to validity. Equal taxation of all is not the constitutional mandate but equal taxation of those "similarly situated." (*Times Mirror*, 192 Cal.App.3d at p. 179.) There need only be a rational basis for the classification used, even though more equitable classifications may exist. Here a rational basis exists for grouping cable television with telephone, gas and electric service. And because the record contains no evidence of intent to suppress ideas and no evidence such suppression will result from enforcement of Ordinance No. 89-047, we find no First Amendment violation.[3]

## III

Plaintiffs also contend the addition of cable television to the utility users tax violates the franchise agreement between City and SCT. As previously indicated, that agreement prohibited City from imposing any "monetary or property obligation" on SCT or its subscribers "except any tax, fee or assessment of general applicability." Plaintiffs contend this provision was intended to protect the First Amendment rights of SCT and its subscribers. As support, plaintiffs rely on the declaration of Richard Davis, the chief executive officer of SCT, who avers: "The purpose of the [limitation] was to incorporate in Resolution and contractual form the full breadth of Plaintiff SCT's First Amendment rights with respect to any further regulatory fees, assessments or taxes."

Because we reject plaintiffs' First Amendment challenge, their contract challenge must also fail. If the provisions in question were intended to prohibit any tax, fee or assessment contrary to the First Amendment, those provisions are not violated by the addition of cable television to the utility users tax which, as we have indicated, does not violate the First Amendment.

In their reply brief on appeal plaintiffs for the first time also contend the utility users tax violates the franchise agreement because it does not apply to

---

[3]Plaintiffs contend the record does contain evidence City intended the tax as a form of punishment directed at SCT because of past rate increases. However we have been cited no evidence of intent to punish SCT because of views expressed, which is the only concern of the First Amendment.

*all* businesses. According to plaintiffs, a tax of general applicability must apply to all businesses. They rely on language from several cases, including *United Artists Communications, Inc.* v. *City of Montclair, supra,* 209 Cal.App.3d at pages 252-253, where the court indicated the tax in question discriminated against First Amendment speakers and was not one of general applicability because it was not targeted at "all businesses."

We reject this contention for a number of reasons. ■ First, "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. [Citations.]" (9 Witkin, Cal. Procedure (3d ed. 1985) § 496, p. 484, italics omitted; *Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335 fn. 8 [265 Cal.Rptr. 788].) "To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission." (*Ibid.*) ■ Plaintiffs give no reason for failure to argue this in their opening brief.

Second, a tax of general applicability need not apply to all. In *Times Mirror* the tax applied only to those engaged in wholesale and retail business activities. In *Leathers* the tax applied to designated types of businesses and not others. Both of these taxes are nevertheless considered generally applicable. And, while both were admittedly broader than the tax in question here, we are aware of no breadth requirement for a tax of general applicability. It is enough that the tax is not a special assessment and does not discriminate against a particular taxpayer or business.

Finally, plaintiffs themselves have equated the term "general applicability" with First Amendment considerations. As previously indicated, the declaration of SCT's general manager indicates the parties intended the term to mean a tax not prohibited by the First Amendment. The record contains no evidence of a contrary intent.[4] We therefore reject plaintiffs' franchise agreement claim.

The judgment is affirmed.

Blease, J. and Nicholson, J., concurred.

A petititon for a rehearing was denied October 16, 1991, and appellants' petition for review by the Supreme Court was denied January 16, 1992.

---

[4]Defendants did present evidence below suggesting the parties intended the restriction to taxes of general applicability to permit imposition of a utility users tax. However, apparently because this evidence was untimely presented, it was stricken at oral argument. Defendants do not claim error in the rejection of this evidence.