[No. C052238. Third Dist. Apr. 3, 2007.]

CEQUEL III COMMUNICATIONS I, LLC, Plaintiff and Appellant, v.
LOCAL AGENCY FORMATION COMMISSION OF NEVADA COUNTY,
Defendant and Respondent;
TRUCKEE DONNER PUBLIC UTILITY DISTRICT et al., Real Parties in
Interest and Respondents.

312

**COUNSEL**

Coblentz, Patch, Duffy & Bass, Richard R. Patch, Gregg M. Ficks, Sabrina L. Feve; Diamond ◊ Baker and Craig A. Diamond for Plaintiff and Appellant.

Law Offices of P. Scott Browne, P. Scott Browne and Marsha A. Burch for Defendant and Respondent.

Law Office of Porter Simon, Steven C. Gross; Miller, Owen & Trost, Nancy C. Miller and Madeline E. Miller for Real Parties in Interest and Respondents.

**OPINION**

**CANTIL-SAKAUYE, J.**—In this action Cequel III Communications I, LLC (Cequel), a franchised cable television provider, sought to invalidate the Local Agency Formation Commission of Nevada County's approval of the application of Truckee Donner Public Utility District (District) to provide broadband services, including cable television, to citizens within its jurisdictional limits. The trial court entered judgment for the Local Agency Formation Commission of Nevada County (LAFCo) on Cequel's three causes of action for validation (Code Civ. Proc., § 863), writ of mandate (Code Civ. Proc., § 1085), and declaratory relief. On appeal Cequel does not challenge the trial court's decision on its validation cause of action, but contends the trial court erred in denying its petition for writ of mandate because (1) the District lacks legal authority to provide cable television services, (2) LAFCo violated its statutory duty to determine whether there was a need for the proposed services and the services could be provided on a fiscally sound basis, and (3) LAFCo violated its duty to conduct an independent determination of whether the District was authorized to provide broadband services. We disagree and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 22, 1999, the District submitted an application to LAFCo seeking authorization to offer telecommunication services, which the District described as wholesale high-speed telephony and data transport, Internet data transport, and cable television, within the District's boundaries, generally described as the greater Truckee area.

Cequel's predecessor in interest, USA Media, opposed the District's entry into the cable television market on the basis cable television service was not a utility service the District was authorized to provide. In light of this opposition and on advice of counsel, LAFCo required the District to agree to indemnify LAFCo for all costs of defending LAFCo in any litigation or administrative proceeding brought in connection with the District's application.

LAFCo formed an ad hoc committee to work with the District in evaluating the application. After review of the application materials, a staff report, the report of the ad hoc committee and a public hearing, LAFCo approved resolution No. 01-01 on January 18, 2001, determining it was in the interest of the public that the District be permitted to provide the new services to the community. LAFCo approved the District's application subject to several specific terms and conditions, including that the District prepare a draft master service element for the communications services it intended to

provide, that the District adopt a risk mitigation plan adequate to ensure its water and electrical service ratepayers would not be required to subsidize the new services, and that the District obtain franchise agreements with all applicable jurisdictions or reach alternative agreements satisfactory to the agencies. Upon completion of the terms and conditions, a certificate of compliance would be issued by LAFCo. Resolution No. 01-01 stated: "Only upon issuance of the Certificate of Compliance shall LAFCo['s] approval to provide the additional class of service be effective." The resolution gave the District two years to comply with the requirements before LAFCo's approval would expire. The two-year period could be extended on the District's showing of a good faith effort to satisfy the requirements.

On October 22, 2002, LAFCo approved a resolution extending the time for the District to comply with the terms and conditions of resolution No. 01-01 until January 27, 2005.

In July 2004 a revised master service element for broadband telecommunications services was submitted by the District to LAFCo. The District also submitted a final risk mitigation plan and a revised "Fiber to the User Business Plan" to LAFCo on July 30, 2004. The District provided LAFCo with a legal opinion regarding its financing and a copy of its earlier legal opinion regarding its authority to provide cable television service. LAFCo obtained an independent certified public accountant review of the District's financial projections for the provision of the service and a legal opinion regarding the District's risk mitigation plan. After extensive review, the ad hoc committee of LAFCo recommended LAFCo accept the master service element prepared by the District and incorporate it into the District's sphere of influence plan, determine the risk mitigation plan provides adequate assurance the District's water and electrical service ratepayers will not be required to subsidize the new services, and issue a certificate of compliance.

After a public hearing on August 11, 2004, LAFCo unanimously adopted resolution No. 04-09 accepting the District's master service element and amending the District's sphere of influence plan accordingly. LAFCo also unanimously approved a certificate of compliance certifying the District had complied with the conditions of resolution No. 01-01. LAFCo adopted resolution No. 04-15 extending the time to begin providing services to January 1, 2008.

On August 26, 2004, Cequel requested LAFCo reconsider resolution No. 01-01, resolution No. 04-09, resolution No. 04-15, and its certificate of compliance relating to the District's application to offer new services. Cequel first claimed LAFCo failed to independently determine that the District's business plan describes services that are needed and that the District can

provide such services on a fiscally solvent basis. Second, Cequel claimed LAFCo failed to determine whether existing ratepayers will have to or already have subsidized the District's proposed new services. Third, Cequel claimed LAFCo improperly determined the new services were permissible utility services the District was authorized to provide. Cequel outlined a number of new or different facts relevant to its request.

At its September 16, 2004, meeting LAFCo reviewed the request for reconsideration. LAFCo continued the public hearing on the matter and directed the LAFCo ad hoc committee to review the request and develop recommendations for action. The ad hoc committee met a number of times thereafter to discuss the issues and hear testimony from the District and its potential competitors. The ad hoc committee submitted an extensive report, including responses, findings, and recommendations, to LAFCo regarding Cequel's request for reconsideration. At its public hearing on October 14, 2004, LAFCo reconsidered the resolutions and approved an amended resolution No. 04-09, an amended resolution No. 04-15, and an amended certificate of compliance with specific findings and determinations.

On October 18, 2004, Cequel filed its complaint in the trial court challenging LAFCo's actions. Trial took place on November 7, 2005. On December 16, 2005, the trial court issued a 31-page decision resolving the issues raised by the parties in the action. Judgment was subsequently entered in favor of LAFCo on all causes of action and this appeal followed.

## DISCUSSION

### I.

#### Cequel's Challenges to LAFCo's Determinations in Resolution No. 01-01 Are Not Time-barred

According to LAFCo, Cequel is time-barred from challenging the determinations made by LAFCo in 2001 by resolution No. 01-01. LAFCo argues it intended its determination of both the District's authority to provide the proposed services and the need for such services to be final at the time of resolution No. 01-01 and that the failure of Cequel or its predecessor in interest to timely challenge the determinations made in that resolution precludes the challenges made here. LAFCo claims the doctrine of laches bars Cequel's challenges.[1]

---

[1] The District does not assert this position on appeal and indeed, counsel for the District told the trial court it was the District's position "that [Cequel] has the right through writ of mandate to question the issue of [the District's] authority."

■ Other than citing one case defining "laches," LAFCo's brief on appeal cites absolutely no legal authority supporting these arguments. This court does not have to address an argument for which no authority is furnished. (*Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 384 [127 Cal.Rptr.2d 917].) In any event, the arguments are meritless.

LAFCo's arguments presuppose Cequel or its predecessor could have properly filed a court action challenging resolution No. 01-01 immediately after its adoption. The language of resolution No. 01-01, however, conditions LAFCo's approval of the District's application on the District's further preparation of a master service element, adoption of a risk mitigation plan, and obtainment of franchise agreements, giving the District two years initially to accomplish these tasks. Resolution No. 01-01 provides LAFCo will only issue a certificate of compliance after the completion of all of these additional items. Resolution No. 01-01 then states: "Only upon issuance of the Certificate of Compliance shall LAFCo approval to provide the additional class of service *be effective*." (Italics added.) Thus, until the District successfully completed the additional requirements and a certificate of compliance was issued, LAFCo's approval was not final, but only tentative. There was no certainty the District would be able to successfully meet the additional requirements. Any legal challenge filed immediately after the adoption of resolution No. 01-01 and before LAFCo's issuance of a certificate of compliance would have been premature.

As Cequel did not have the ability to file an earlier legal challenge, the issues it raises regarding the determinations made by LAFCo in resolution No. 01-01 are timely.

## II.

### The District Has Authority to Provide Cable Television Services

#### A. *Standard of Review*

The District's authority to provide cable television services is a question of first impression in California. The trial court concluded the District had the authority to provide such service. The parties disagree as to the applicable standard of review of that decision on appeal. Cequel contends the question is subject to de novo review by this court. Although the District agrees the standard of review for this question is the independent judgment of the court,

it contends we must nevertheless give deference to the determination of the agency, i.e., to LAFCo's interpretation of the relevant statutes. LAFCo disagrees that a de novo or independent judgment standard applies. It contends our review of this issue is limited to whether its decision was "clearly erroneous" under the applicable statutes. We agree with Cequel that the applicable scope of review is de novo without deference to LAFCo's determination of the issue.

To resolve the District's authority to provide cable television, we must determine the proper statutory construction of Public Utilities Code section 16461.[2] Issues involving the interpretation and application of statutes are subject to de novo review. (*Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1140 [41 Cal.Rptr.3d 10]; *Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 496 [5 Cal.Rptr.3d 283].) Admittedly, "when an administrative agency is charged with enforcing a particular statute, its interpretation· of the statute will be accorded great respect by the courts 'and will be followed if not clearly erroneous. [Citations.]' [Citation.]" (*Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668–669 [150 Cal.Rptr. 250, 586 P.2d 564].) Here, however, LAFCo is not "charged with enforcing" the Public Utility District Act, from which the District derives its authority to provide services. (§ 15501 et seq.) LAFCo's determination of the District's authority to provide the new services covered by its application to LAFCo is not entitled to special consideration or deference.

### B. *Merits*

■ The District is a public utility district (PUD) governed by the Public Utility District Act. (§ 15501 et seq.) Section 15701 provides PUD's "may exercise the powers expressly granted." Section 16461, in turn, grants PUD's the power to "acquire, construct, own, operate, control, or use, within or without or partly within and partly without the district, works for supplying its inhabitants with light, water, power, heat, transportation, telephone service, or other means of communication, or means for the disposition of garbage, sewage, or refuse matter, and [districts] may do all things necessary or convenient to the full exercise of the powers granted in this article." ■ The District and LAFCo claim the Legislature's grant of authority in section 16461 for a PUD to acquire, construct, own, and operate works for supplying its inhabitants with "other means of communication" authorizes the District to supply broadband services, including cable television, to its inhabitants. We agree.

---

[2] Hereafter, undesignated statutory references are to the Public Utilities Code.

We stated the applicable principles of statutory construction in *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107 [113 Cal.Rptr.2d 90], as follows:

■ "The primary objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citation.] To do so, a court first examines the actual language of the statute, giving the words their ordinary, commonsense meaning. [Citation.] The statute's words generally provide the most reliable indicator of legislative intent; if they are clear and unambiguous, '[t]here is no need for judicial construction and a court may not indulge in it.' [Citation.] Accordingly, '[i]f there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]

■ "Where, however, the statutory language is ambiguous on its face or is shown to have a latent ambiguity such that it does not provide a definitive answer, we may resort to extrinsic sources to determine legislative intent. [Citations.] Under this circumstance, 'the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes.' [Citation.] 'In such cases, a court may consider both the legislative history of the statute and the wider historical circumstances of its enactment to ascertain the legislative intent.' [Citation.]" (*Lewis v. County of Sacramento, supra,* 93 Cal.App.4th at pp. 119–120.)

The phrase "other means of communication" in section 16461 does not explicitly include or exclude the provision of broadband services, in particular, cable television service. In considering whether cable television comes within the authority and powers granted by the language of section 16461, we find helpful a 1962 opinion of the California Attorney General. In such opinion the Attorney General considered whether an existing PUD could acquire, construct, own and operate a translator television installation. (40 Ops.Cal.Atty.Gen. 25, 26 (1962).) The opinion concluded the district was authorized to provide such service as the installation was a building used for a public purpose as authorized by section 16463, but also under the alternate authority of section 16461 for providing "other means of communication." (40 Ops.Cal.Atty.Gen. at pp. 26–27.)

The opinion expressly considered the scope of the language "other means of communication" and determined the "or" used in section 16461 to separate "other means of communication" from "telephone service" was not intended

by the Legislature to be used in the disjunctive, corresponding to " 'either this or that.' " (40 Ops.Cal.Atty.Gen., *supra*, at p. 27.) A PUD was not required to choose between providing telephone service or acquiring works to provide some other alternate means of communication. (*Ibid.*) For one thing, such a construction of section 16461 would be inconsistent with the clear legislative understanding of the authority of municipal corporations to provide services, which corporations were authorized by constitutional language virtually identical to section 16461. (Cal. Const., art. XI, former § 19 (1911), see now Cal. Const., art. XI, § 9 (1970).) Moreover, it was also indicative of legislative intent that a comma was used to separate the phrase "telephone service" from "other means of communication," making the two phrases two separate classes. (40 Ops.Cal.Atty.Gen., *supra*, at p. 28.)

Having concluded the phrase "other means of communication" was not limited to those means of communication that are similar to, and used as alternate to, telephone service, the opinion turned to the meaning of the word "communication" as used in section 16461. The opinion adopted a broad construction of the term as meaning " ' "intelligence, news, that is communicated or imparted, a written or verbal message," and is not restricted to mere words but "includes acts as well, embracing every variety of affairs that can form the subject of negotiation, interviews, or actions between two persons, and every method by which one person can contrive impressions or information from the conduct, condition, or language of another . . . ." ' " (40 Ops.Cal.Atty.Gen., *supra*, at p. 28, citing *In re Cattalini* (1946) 72 Cal.App.2d 662, 667–668 [165 P.2d 250].) Television, as a means of mass communication, fell within this definition. Thus, the district was authorized by section 16461 to own and operate a translator television installation to supply its inhabitants with such a means of mass communication. (40 Ops.Cal.Atty.Gen., *supra*, at pp. 28–29.)

■ We agree with this Attorney General opinion. The phrase "other means of communication" used in section 16461 is not limited to means of communication similar to telephone service. The term "communication" used in section 16461 broadly means any form of passing information between two persons, including mass communication in the form of television. Cable television is a means of communication that PUD's are authorized to provide their inhabitants.

Our construction of the phrase "other means of communication" in section 16461 finds further support from the California Supreme Court's opinion in *In re Orosi Public Utility Dist.* (1925) 196 Cal. 43 [235 P. 1004] (*Orosi*) and a second opinion of the California Attorney General found at 54 Ops.Cal.Atty.Gen. 135 (1971).

The issue before the Supreme Court in *Orosi* was the constitutionality of the 1921 legislation providing for the incorporation of PUD's in unincorporated territory and therefore, the validity of the Orosi Public Utility District's proposed bond issuance without prior notice to individual landowners. (*Orosi, supra*, 196 Cal. 43, 46–47, 50.) To resolve this issue, the court determined it was necessary to consider the nature of a PUD formed pursuant to the statute. (*Id.* at p. 50.) In so doing, the Supreme Court compared the constitutional authority of a municipality to operate public utilities with the statutory authority given to a PUD. The court noted that: "In 1911 the constitution of California was amended to provide that 'any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service, or other means of communication. Such works may be acquired by original construction, or by the purchase of existing works, including their franchises, or both.' ([Cal.] Const., art XI, sec. 19.) . . . The adoption of the amendment definitely settled and removed all doubt from the question of the right of cities and towns to own and operate the kind of public utilities designated by the constitution." (*Id.* at p. 55.)

The Supreme Court continued: "In enacting the statute here in question [the Public Utility District Act], the [L]egislature has made provision whereby the inhabitants of the state living outside the limits of cities and towns may serve their own purposes through the operation of the same kind of utilities, when organized for that purpose. [¶] That such was the intention of the [L]egislature may be gleaned from a reading of the provision declaring the purposes for which public utility districts may be created in unincorporated territory. They are the acquisition, construction, and use of works for supplying the inhabitants of the district with light, water, power, heat, transportation, telephone service, or other means of communication, or means for the disposition of garbage, sewage, or refuse matter. It has the power to do all things necessary or convenient to the full exercise of the powers granted by the act. It is significant that, when the [L]egislature came to pass the act extending to the inhabitants outside of incorporated cities and towns the privileges in regard to the acquisition and use of their own public utilities that are granted by the state constitution to municipalities, it should have followed so closely the language of the constitutional amendment of 1911 in the statement of the purposes for which the districts may be created. *We are convinced that it was its intention to provide for the creation of public corporations of a quasi-municipal character,* with power to carry on the particular functions committed to them." (*Orosi, supra,* 196 Cal. at pp. 55–56, italics added.) As the Supreme Court concluded the Orosi Public Utility District was properly formed as a quasi-municipal corporation under the Public Utility District Act, allowing it to tax its inhabitants and property

owners for municipal purposes, the Supreme Court rejected the constitutional attack of the individual landowner. (196 Cal. at pp. 59–61.)

Although we recognize municipalities have greater powers and broader authority than PUD's in other areas (*Orosi, supra*, 196 Cal. at pp. 56–57), with respect to the acquisition, construction, and operation of utility services that are identified by the same language for both municipalities and PUD's, the opinion of the California Supreme Court in *Orosi* suggests the authority of cities and districts should be considered the same.

The California Attorney General has issued an opinion concluding general law cities have the authority to construct, own and operate a community cable television system under the constitutional authority of article XI, section 9 (former § 19) to furnish inhabitants with " 'means of communication.' " (54 Ops.Cal.Atty.Gen., *supra*, at p. 137, italics omitted.) Cequel "concedes, as it must, that cable television is a form of communication and that, for the purposes of municipal corporations, could be considered a means of communication authorized within the scope of the constitutional grant of authority," but argues the same result cannot be reached with regard to a PUD's statutory authority. We disagree. The statutory language in section 16461 has been found to intentionally track the constitutional language applicable to the authority of municipal corporations to provide utility services, so as to "extend[] to the inhabitants outside of incorporated cities and towns the privileges in regard to the acquisition and use of their own public utilities that are granted by the state constitution to municipalities." (*Orosi, supra*, 196 Cal. at p. 56.)

Cequel argues, however, a PUD's statutory authority is limited to the provision of "essential" "utility" services, which it claims cable television is not.

Specifically, Cequel points us to the decision of *Television Transmission v. Public Util. Com.* (1956) 47 Cal.2d 82 [301 P.2d 862] (*Television Transmission*), which it claims stands for the proposition that cable television service is not a utility service. Actually, the question before the California Supreme Court in *Television Transmission* was whether a private corporation operating a "community television antenna" furnishing coaxial television antenna service (cable television) to areas of Contra Costa County was a "public utility" so as to be subject to regulation by the Public Utilities Commission (PUC). (*Id.* at p. 84.) The Supreme Court determined the PUC had no jurisdiction over a

private corporation unless it fell within one of the classes of public utilities enumerated by section 216. (47 Cal.2d at p. 85.) The court went on to reject the PUC's finding that the cable television provider was a "telephone corporation" within the meaning of section 216, the only class of utility under section 216 that was conceivably applicable. (47 Cal.2d at pp. 85–89.) Nowhere in the opinion does the Supreme Court ever consider whether cable television can be provided by an undisputed public utility as part of its utility services. *Television Transmission* is of no assistance in determining whether cable television can be offered by a PUD as an "other means of communication," a type of utility service authorized by section 16461.

Similarly, this court's opinion in *Sacramento Cable Television v. City of Sacramento* (1991) 234 Cal.App.3d 232 [286 Cal.Rptr. 470] (*Sacramento Cable*), is inapposite. *Sacramento Cable* involved a challenge by a private cable television company and one of its individual users to a utility user tax imposed by the city on cable television users. (*Id.* at p. 235.) This court recognized a private company providing cable television is not a "utility" under section 216, but found there is nevertheless a clear degree of similarity between telephone, gas, electric and cable television service that justified classifying cable television with the other utilities services for purposes of imposing a utility users' tax. (*Sacramento Cable, supra,* at pp. 241–242.) The case is not authority on the question of whether cable television service can be provided by a PUD pursuant to section 16461.

In *Orange County Cable Communications Co. v. City of San Clemente* (1976) 59 Cal.App.3d 165 [130 Cal.Rptr. 429] (*Orange County Cable*), a private cable television provider sought a writ of mandate to compel the city to raise the rates it was allowed to charge its subscribers for its service. (*Id.* at p. 167.) The appellate court found specious the argument that the cable television company had a constitutional right to a just and reasonable return on its investment. (*Id.* at p. 170.) As the private cable television company was not a public utility, the relationship of the parties was contractual and the city was only required to act in good faith. (*Id.* at pp. 170–172.) The cable television company failed to show any evidence the city acted in bad faith. (*Id.* at pp. 172–174.) Again, this case does not assist our inquiry into whether a PUD is authorized to provide cable television service.

*Greening v. Johnson* (1997) 53 Cal.App.4th 1223 [62 Cal.Rptr.2d 214] (*Greening*), was an action brought by mobilehome park owners against residents of the mobilehome park to recover unpaid monthly charges for cable television. The appellate court held the Mobilehome Residency Law

(Civ. Code, § 798 et seq.) does not authorize a park owner to charge for cable television services not requested or used. (*Greening, supra,* at p. 1230.) The court stated it was at best uncertain from the language of Civil Code section 798.31 whether cable television could be considered a permissible utility fee under that section, but as the legislative history reflected an intent not to allow charges for services not requested or used, it concluded the owners could not unilaterally arrange for cable television service and require the tenants to pay the charges. (*Greening, supra,* at pp. 1227–1230.) In the course of its discussion, the court stated: " 'Utilities,' in fact, are most commonly thought of as charges for *essential* services provided by government regulated and sanctioned monopolies . . ." and "cable television [cannot] reasonably be considered 'essential' in the way that such services as water and electricity are." (*Id.* at p. 1228.) While it may be true that normally utilities are thought of as being essential services such as water and electricity, we do not see *Greening* as providing support for Cequel's claim that cable television cannot be a utility service provided under section 16461.

Cequel contends the list of works contained in section 16461 are subject to the limitation in section 16467 that all such works must be utility works or services. Section 16467 provides, in part, "[o]nly revenue producing utilities shall be acquired, owned, or operated by a district." Cequel claims the word "utilities" used in this provision indicates a PUD may operate only utility works and services. Cequel then reiterates cable television is not a utility service.

 Section 16467 is directed at the financing of a PUD's services, not at defining what services may be offered. Nevertheless, to the extent it can be read to limit a district's services to utility services, we view all of the works identified in section 16461 as being utility services by virtue of their being authorized services of a PUD. Cable television fairly comes within the grant of authority in section 16461 for a PUD to supply an "other means of communication." As we have already explained, the cases that conclude a private corporation's provision of cable television service does not make the private corporation a utility subject to PUC regulation (*Television Transmission, supra,* 47 Cal.2d 82; *Sacramento Cable, supra,* 234 Cal.App.3d 232; *Orange County Cable, supra,* 59 Cal.App.3d 165) are not authority that cable television may not be supplied by a PUD as one of its utility services under section 16461. Section 16467 does not suggest otherwise.

We have also reviewed and carefully considered the other authorities cited by Cequel for its claim that cable television may not be provided by the District because it is not an "essential" utility service. *Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406 [67 Cal.Rptr. 97, 438 P.2d 801], involved a challenge by the bus company to the PUC's decision ordering it to

extend its commuter bus service. The Supreme Court concluded the PUC did not exceed its authority in making the order. The reference in the decision to "public convenience and necessity requir[ing] operation," pointed out by Cequel, is a reference to certificates of convenience and necessity to be issued by the PUC for motor carriers and has nothing to do with the issue at hand. *Wood v. Public Utilities Com.* (1971) 4 Cal.3d 288 [93 Cal.Rptr. 455, 481 P.2d 823], dealt with the PUC's creation of certain credit rules adopted as part of the utilities' rate tariffs. (*Id.* at p. 291.) The decision notes the PUC "deals with services that are essential." (*Id.* at p. 295.) Such passing comment was not made in the context of limiting utilities to the provision of essential services. *Cantu v. Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160 [234 Cal.Rptr. 365], is an inverse condemnation action. In the course of the opinion, the appellate court noted, "Civil Code section 1001 provides a private right of eminent domain to acquire an easement to provide utility service defined as 'water, gas, electric, drainage, sewer, or telephone service.'" (*Id.* at p. 164.) The definition of utility services provided in Civil Code section 1001 is not applicable here. In *Green v. Superior Court of San Francisco* (1974) 10 Cal.3d 616 [111 Cal.Rptr. 704, 517 P.2d 1168], the Supreme Court held "a warranty of habitability is implied by law in residential leases in this state and that the breach of such a warranty may be raised as a defense in an unlawful detainer action." (*Id.* at p. 637.) The case *does not aid our construction of section 16461.*

Nor do we see section 16463 as a restriction on a PUD's services under section 16461 to essential services.

Section 16463 provides: "A district may acquire, construct, own, complete, use, and operate a fire department, street lighting system, public parks, public playgrounds, golf courses, public swimming pools, public recreation buildings, buildings to be used for public purposes, and works to provide for the drainage of roads, streets, and public places, including, but not limited to, curbs, gutters, sidewalks, and pavement of streets. For purposes of this division, all of those projects shall be considered a public utility or public utility works."

According to Cequel, the only possible explanation for the last sentence of section 16463 expressly declaring the listed projects to be "a public utility or public utility works" is that the Legislature, "in light of the unquestionable limitation imposed by the [Public Utilities] Code restricting PUDs to essential utility services," deemed "certain non-essential, albeit desirable, additional municipal-type services as a public utility for the purpose of the [Public Utility District] Act."

In light of the limitation of a PUD's powers to those expressly granted (§ 15701), the most reasonable understanding of section 16463 is that the Legislature desired to expand the powers granted a PUD to include additional utility services beyond those traditionally considered utility services, i.e., those denominated by section 16461. To the extent those additional services can be considered nonessential services, section 16463 actually suggests utility services do not have to be essential before a public utility district may offer them. They need only be covered by an express grant of statutory authority. The existence of section 16463 certainly does not limit the powers granted a PUD by section 16461.

Finally we come to Cequel's argument regarding section 16486, the statute governing the Kirkwood Meadows PUD. In 1981 the Legislature enacted section 16486, which provides, in pertinent part: "(a) *In addition to all other powers*, excepting telephone service, authorized by this division, the Kirkwood Meadows Public Utility District may acquire, construct, own, and operate public parking facilities and *cable television* facilities and may provide snow removal and road maintenance services for all roads open to the public, including, but not limited to, public roads and roads offered for dedication but not accepted, within the district." (Italics added.) Cequel claims "the Legislature explicitly acknowledged that specific statutory authorization was necessary in order to enable the Kirkwood Meadows PUD to provide cable television services" by its use of the language "[i]n addition to all other powers" at the beginning of section 16486. Cequel's argument essentially is that if a PUD already had the authority to offer cable television, the Legislature would not have seen fit to expressly grant Kirkwood Meadows PUD the authority to offer cable television service as an additional power.

Such interpretation is not the only way section 16486 can be read. The phrase "[i]n addition to all other powers" can also be reasonably read as the Legislature's method of incorporating sections 16461 and 16463 into the powers granted the Kirkwood Meadows PUD and its express authorization of cable television service can be seen as the Legislature's method of making sure cable television was an included power, in light of the lack of controlling authority on whether cable television was an "other means of communication" within the meaning of section 16461. When statutory language is ambiguous, we may resort to extrinsic sources, including legislative history, to determine legislative intent. (*Lewis v. County of Sacramento, supra*, 93 Cal.App.4th at pp. 119–120.)

The trial court granted Cequel's request for judicial notice of a packet of documents constituting the Assembly Final History for Assembly Bill No. 1092 (1981–1982 Reg. Sess. & 1st Ex. Sess.) which, among other things, added section 16486 to the Public Utilities Code. Included in the materials judicially noticed is an analysis of the proposed legislation for Kirkwood Meadows PUD prepared for the bill's proponent, sent to the bill's author, and located in the files of the Assembly Committee on Local Government. (Neumiller & Beardslee, analysis sent to Assemblyman Waters, Feb. 23, 1981 (Analysis).)[3] The Analysis confirms the reading of section 16486 as being a clarification of the existing authority for a PUD to provide cable television service, as opposed to a grant of a new power. The Analysis states: "while existing law appears to give a Public Utility District somewhat broad authority to provide, inter alia, for '. . . transportation, phone service or other means of communication,' it does not specify whether this would include facilities or services for snow removal and road maintenance, cable television, and public parking. (Pub. Util. Code § 16461.) Attorney General's Opinion No. 62-100 (July, 1962) opines that a Public Utility District may, under existing law, own, operate, construct and so forth, a translator television installation and that such facility 'need not be operated on a self-sustaining revenue-producing basis.' (Opinion, p. 29.) *While the Attorney General's reasoning in this opinion suggests that existing law would probably apply to the facilities and services proposed* by this bill, *it is desirable that there is certainty regarding these specified powers so as to ensure that the district would not later be challenged for operating or financing services and facilities beyond the scope of its legal authority.*" (Analysis, pp. 8–9, italics added.) The Analysis, thus, contradicts the notion the Legislature intended cable television service to be a new, additional power extended solely to the Kirkwood Meadows PUD. It appears the intent of the Legislature was to specify the named services and facilities in section 16486 in order to forestall the very kind of challenge involved here.

We conclude section 16486 does not require us to reach a different conclusion as to the inclusion of cable television service within the scope of section 16461. A PUD may choose to provide cable television service as an "other means of communication" under section 16461.

---

[3] Letters to individual legislators, including the bill's author, are not matters constituting cognizable legislative history if they were not communicated to the Legislature as a whole. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37–38 [34 Cal.Rptr.3d 520].) Here, however, the analysis and letter were apparently provided to the Assembly Committee on Local Government and included in the final history of the bill, making the material a proper subject of judicial notice. (*Id.* at pp. 32–33.) We also observe it was Cequel who sought judicial notice of the material in the trial court and that on appeal there has been no objection to the material.

## III.

### Substantial Evidence and LAFCo Findings Support the Decision to Approve the District's Application

A. *Standard of Review*

With respect to Cequel's claim "the administrative record lacks substantial evidence that LAFCo complied with its duty to determine that the [District's] services were necessary and economically sound" (capitalization omitted) and that LAFCo failed to make an independent determination of whether the District was authorized to provide broadband services, Government Code section 56107 provides the applicable standard of review. Subdivision (c) of section 56107 provides: "In any action or proceeding to attack, review, set aside, void, or annul a determination by a commission on grounds of noncompliance with this division, any inquiry shall extend only to whether there was fraud or a prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the court finds that the determination or decision is not supported by substantial evidence in light of the whole record."

B. *LAFCo Made a Finding of Need and Cequel Has Not Shown Such Finding Is Not Supported by Substantial Evidence*

Cequel contends Government Code section 56301 requires LAFCo to collect information to ensure community needs are serviced in a "logical and reasonable manner."[4] Cequel argues it was not logical and reasonable to approve the District's application to provide "non-essential services that other entities are already providing" and there is no substantial evidence in the administrative record showing that it was. Cequel goes on to contend LAFCo was required to do a needs assessment in 2004 prior to giving final approval to the District's application. Pointing to a recommended finding attached to the October 2004 ad hoc committee report on Cequel's request for reconsideration that states in part that the issue of need "was determined by Resolution No. 01-01, and that decision is final," Cequel claims LAFCo

---

[4] Government Code section 56301 actually states, in part: "One of the objectives of the [LAFCo] commission is to make studies and to obtain and furnish information which will contribute to the logical and reasonable development of local agencies in each county and to shape the development of local agencies so as to advantageously provide for the present and future needs of each county and its communities."

concedes it did not conduct a needs assessment after 2001. In its opening brief, Cequel claims there is not substantial evidence the District's ratepayers needed the services in August 2004,[5] but in its reply brief, after the District and LAFCo point out evidence in the administrative record supporting a finding of need in 2004, Cequel contends that "[w]hether there was or was not evidence of need in 2004 to support an assessment is of no consequence if, as occurred here, LAFCo refused to make a contemporaneous needs assessment. . . . Because LAFCo refused to make a needs determination in 2004, the only question is whether the 2001 needs assessment was sufficient."

Cequel asserted the requirement for a current needs assessment in 2004 in its August 2004 request for reconsideration. The ad hoc committee responded in writing to Cequel's claim. Specifically, the committee described LAFCo's prior determination of need, but then went on to describe its review of "current" need, noting it "assessed the District's demonstration and statements of projected needs for the proposed services and, with the Commission at Public Hearings, heard testimony from the public supporting the need for the services." The formal committee report responding to the request for reconsideration stated a determination of need was made in 2001 and that such determination should not be revisited. However, the committee report went on to state: "Nevertheless, review of the materials submitted by the District and by private service providers [Cequel] and SBC indicate that the District plans to offer levels of service (such as high speed internet access) that are not being offered by competitors. Moreover, in contrast to the current providers, the District's plans indicate it would provide an equal level of service to every home within the District." The committee report recommended LAFCo adopt a number a findings and determinations as part of amended resolutions on the District's application. Cequel cites only a portion of one such finding, the portion in which the committee states the issue of need "was determined by Resolution [No.] 01-01, and that decision is final." Another proposed finding, under the heading "Unmet Needs," states: "[T]he level and scope of services contemplated by the District was not provided as of 2001 (when the Commission first approved the request) *nor at the present time.*" (Original italics.) These findings were subsequently approved and

---

[5] The heading for this argument in Cequel's opening brief also contends there is insufficient evidence that LAFCo complied with its duty to determine the District's proposed services were "economically sound." As Cequel does not include any meaningful discussion of this issue in its briefs, we need not address or discuss the issue. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

included by LAFCo as part of amended resolution No. 04-09, amended resolution No. 04-15, and the new certificate of compliance, adopted in October 2004.

Thus, the record shows LAFCo took the position it was not required to do a new needs assessment in 2004, but it also went ahead and did such an assessment, taking evidence, holding a public hearing, and making specific findings in 2004 of the continuing need for the District's broadband package of services.[6] Cequel has not only failed to acknowledge these express findings, but has completely failed to show how they were not supported by substantial evidence in the record.[7] Indeed, in its reply brief, Cequel abandons its sufficiency of evidence challenge. In these circumstances, we need not further discuss the substantial evidence in favor of LAFCo's 2004 findings.

C. *Cequel Has Not Shown LAFCo Failed to Make an Independent Determination of the District's Authority to Provide Broadband Services*

Cequel contends LAFCo failed to independently determine the District was authorized to provide broadband service in violation of its own written policies. (LAFCo policy I.B.4(b) (2003) [LAFCo must be neutral, independent, and balanced in representation of counties, cities, and special districts]; LAFCo policy I.E.2 (1996) [LAFCo is an independent agency from county, cities and districts]; LAFCo policy I.E.4 (2003) [Legislature requires the commissioners to exercise their independent judgment in carrying out the provisions of the act on behalf of the public as a whole].) According to Cequel, LAFCo abdicated its oversight duties when it obtained an indemnification agreement with the District, under which the District agreed to

---

[6] We need not address whether LAFCo was required to undertake the new needs assessment because, in any event, LAFCo did the needs assessment update and made findings in 2004 regarding current need.

[7] Where the appellant challenges the sufficiency of the evidence, the reviewing court starts with the presumption that the record contains evidence sufficient to support the judgment; it is the appellant's affirmative burden to demonstrate otherwise. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362] (*Foreman & Clark*); *Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368 [15 Cal.Rptr.3d 430].) The appellant's brief must set forth *all* of the material evidence bearing on the issue, not merely the evidence favorable to the appellant, and must show how the evidence does not sustain the challenged finding. (*Foreman & Clark, supra,* at p. 881; *Baxter Healthcare Corp. v. Denton, supra,* at p. 368.) If the appellant fails to set forth all of the material evidence, its claim of insufficiency of the evidence is forfeited. (*Foreman & Clark, supra,* at p. 881; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 782 [125 Cal.Rptr.2d 804].) Cequel has failed to set forth all the material evidence and has merely cited some evidence in its favor.

indemnify LAFCo in the event of litigation arising out of the application. Pointing to comments made in a LAFCo staff report and by LAFCo legal counsel, Cequel claims LAFCo simply relied on the indemnification agreement and failed to make its own determination of the District's authority to provide the new proposed services.

We do not read the record as Cequel does. Prior to submitting its application to provide the new services to LAFCo, the District asked its legal counsel to review the District's authority to offer a fiber optics cable system. Counsel opined such system was an "other means of communication" within the meaning of section 16461. The District submitted its application to LAFCo. Cequel's predecessor, USA Media, opposed the District's entry into the cable television market. A legal opinion drafted at the request of USA Media argued the District was not authorized to provide cable television service under current statutory law. The District responded to LAFCo with a detailed legal analysis of the District's position as to its legal authority. USA Media provided two further discussions of its legal opinion as to the District's lack of authority.

This history provides the context for the comments in the LAFCo staff report that "[i]n the presence of such a dispute, approval by LAFCo of the District's request for authorization to provide such services could result in a legal challenge to the LAFCo decision by USA Media. [¶] LAFCo could avoid such litigation by requiring that the District resolve the legal question before deeming the application complete. The District, however, desires that LAFCo proceed prior to final resolution of the dispute with USA Media. To mitigate any impact on LAFCo, the District is willing to provide an indemnification agreement to protect the Commission in the event of a legal challenge." It was also in this context that questions were posed by LAFCo commissioners to LAFCo's legal counsel regarding the authority of the District to provide the new services. Counsel noted the issue was unclear, but it was his opinion there was authority for the District to proceed. He stated he could not "tell [the commission] absolutely conclusively because the law in this area is ambiguous. If that is so, my feeling is that, if the [D]istrict wants to proceed, and they're prepared to indemnify LAFCo . . . then we can proceed without absolute clarity in the law."

These comments do not demonstrate a refusal or failure of LAFCo to determine the authority of the District to provide the proposed services, but an understanding that the issue had not previously been resolved by the

courts and that the issue was very likely to be litigated if LAFCo proceeded and ultimately approved the District's application. The comments express LAFCo's natural concern that a decision by it agreeing with the District's position would result in LAFCo incurring substantial. legal costs arising from litigation brought to challenge the District's authority to provide the services. LAFCo could avoid such costs by requiring the District to obtain a judicial resolution of the issue ahead of LAFCo action on the application or it could go ahead and decide the application, but require the District to retain the ultimate responsibility for the costs of litigation through the mechanism of an indemnity agreement if the application was approved. Either way the costs of a legal challenge would be borne in the end by the District's customers. The indemnity agreement, thus, did not shift the costs to the District or abdicate LAFCo's responsibility to independently determine the District's authority.

LAFCo approved the indemnity agreement on January 18, 2001, before considering the District's application to provide broadband services. LAFCo then proceeded to consider the District's application, which necessarily included the District's authority to offer the proposed services. LAFCo heard presentations by the District, USA Media, Pacific Bell and members of the public. At the close of the public hearing on January 18, 2001, LAFCo approved resolution No. 01-01, which determined, among other things, "that it is in the interest of the public that the District be permitted to provide the service to the community." Implicit in LAFCo's approval is a determination that the District had the legal authority to provide the services. This is confirmed by the ad hoc committee's response to Cequel's claim in its 2004 request for reconsideration that LAFCo had failed to make an independent determination of the District's authority. The committee's report states in response: "The issue whether or not the District was authorized under state law to provide broadband services was raised by [Cequel's] predecessor USA Media at the time Resolution [No.] 01-01 was adopted. The Commission considered the issue at that time and was persuaded by [the] opinion of the District's legal counsel that such service was legally authorized."

Cequel has not shown LAFCo violated its duty to make an independent determination of the District's authority to provide broadband services.[8]

---

[8] Cequel's briefs on appeal contain comments that suggest Cequel is also challenging the legality of the indemnification agreement itself. To the extent Cequel is making such an argument, Cequel has failed to provide meaningful discussion of its claim supported by authorities and references to the record under an appropriate separate heading. (Cal. Rules of Court, rule 8.204(a)(1).) The claim has not been properly made and is rejected on that basis. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323 [101 Cal.Rptr.2d 591]; *Kim v. Sumitomo Bank, supra*, 17 Cal.App.4th at p. 979.)

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents. (Cal. Rules of Court, rule 8.276(a).)

Morrison, Acting P. J., and Hull, J., concurred.